543 A.2d 1148

Pavle PAUL, M.D., Appellant

v.

LANKENAU HOSPITAL, and Ralph F. Moriarty.

Pavle PAUL, M.D.

v.

LANKENAU HOSPITAL and Ralph F. Moriarty.

**Appeal of LANKENAU HOSPITAL.**

Superior Court of Pennsylvania.

Argued May 12, 1986.

Filed May 24, 1988.

2.

4

Jeffrey L. Pettit, Philadelphia, for appellant (at 2859) and appellee (at 2958).

James D. Crawford, Philadelphia, for appellant (at 2958).

William H. Pugh, IV, Norristown, for appellees (at 2859).

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, McEWEN, DEL SOLE, BECK, TAMILIA, KELLY and JOHNSON, JJ.

CIRILLO, President Judge *:

This is an appeal from an order of the Court of Common Pleas of Montgomery County dismissing defendant Lankenau Hospital's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and plaintiff Dr. Pavle Paul's motion for removal of nonsuits. Paul had brought suit against Lankenau because of his termination as a research scientist in August of 1980 for removing five small refrigerators from the hospital. Because we believe that the trial court properly upheld the jury verdict for Dr. Paul based on estoppel, properly granted a nonsuit on the counts involving the public policy exception to the at-will employment doctrine, intentional infliction of emotional distress, and implied contract, but improperly nonsuited Dr. Paul on his defamation claim, we affirm in part and reverse in part.

In reviewing the grant or denial of judgment n.o.v., we, as the reviewing court, must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference which can reasonably be drawn from the evidence, and rejecting all unfavorable testimony and inferences. Judgment n.o.v. may be granted only in a clear case where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *Ingrassia Constr. Co. v. Walsh*, 337 Pa.Super. 58, 61, 486 A.2d 478, 480 (1984), *allowance of appeal denied.*

Dr. Pavle Paul received his education and medical degree from the University of Belgrade School of Medicine. He immigrated to this country in 1962; at that time he was hired by Lankenau Hospital for its research department. Although he was not licensed to practice medicine, he was a member of Lankenau's medical staff from 1965 until his termination in August of 1980. Paul did not have a written contract of employment, although medical staff by-laws did exist, and at the time of his termination, Paul was engaged

---

* Preparing an opinion announcing the judgment of the court became this writer's task in November, 1987.

in several projects which had received or were to receive research grants.

During the time he was employed by Lankenau, Paul began to collect and to ship to Yugoslavia discarded hospital equipment. He did so with the knowledge and permission of supervisory employees at Lankenau. These shipments were authorized by one Raymond Stafford, purchasing manager, until his departure from the hospital in 1979. Stafford was replaced by James Vitale as director of material management. Paul continued his practice of collecting discarded equipment and supplies; although he had little contact with Vitale, his relations with the other supervisory employees remained unchanged.

The dispute which eventually led to the termination of Paul's employment arose around five refrigerators that he removed from a basement storeroom. Paul claimed that he had received permission from David D'Urbanis, a storeroom supervisor, to remove the refrigerators. Lankenau contended that the removal was unauthorized, and presented evidence to that effect. Lankenau claimed that it was upon the unauthorized removal of the five refrigerators that it requested Paul's resignation. · Paul was informed that failure to resign would result in possible prosecution. Paul resigned.

Paul then filed suit against Lankenau. His complaint contained nine counts sounding in various tort and contract theories, including defamation, wrongful discharge, intentional infliction of emotional distress, and estoppel. The trial court nonsuited Paul on all counts except for Count IV, which was based upon an estoppel argument. That count went to the jury with four special interrogatories:

Do you find that plaintiff Pavle Paul had permission from David D'Urbanis to take the refrigerators from Lankenau Hospital?

Do you find that it was reasonable for plaintiff to rely on permission from David D'Urbanis to take the refrigerators from Lankenau Hospital and that plaintiff fully satisfied any duty that he may have had to inquire

whether the refrigerators were of no further use to the hospital?

Do you find that plaintiff Pavle Paul resigned voluntarily from his employment at Lankenau Hospital?

Do you find that defendant Lankenau Hospital acted reasonably and believed in good faith that plaintiff Pavle Paul had taken the refrigerators without permission?

The jury found for the plaintiff, answering the first two interrogatories in the affirmative, and the last two in the negative. The trial, which had been bifurcated, then proceeded to the damages phase. The jury awarded Paul $410,000; the trial court remitted the award to $128,000, the amount Paul would have earned from the time of his termination to the date of the jury verdict.

Both parties filed post-trial motions—Paul for a removal of the nonsuits as to the other eight counts of his complaint, Lankenau for judgment notwithstanding the verdict or for a new trial on Count IV. The motions were denied, and both parties appealed. A panel decision of this court was filed on December 27, 1985, and would have affirmed the decision of the trial court. Lankenau petitioned this court for reargument; Paul sought allocatur from the Pennsylvania Supreme Court. After a conference between parties, it was decided that this court would hear both appeals on reargument in the interest of a uniform disposition of the issues. Paul withdrew his petition for allocatur, and reargument was granted both parties.

Lankenau claims that this court's en banc decision in *Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985), should control, and that Paul's claim of estoppel was improperly presented to the jury. Because we find that Paul did indeed make out a claim for estoppel, and that, unlike the employee in *Banas*, Paul showed both a promise and reasonable reliance upon that promise, we find that *Banas* does not control here.

■ Count IV of Dr. Paul's complaint was in assumpsit and claimed that: "defendant Lankenau Hospital had established for at least fifteen years a consistent policy of

permitting plaintiff to remove medical equipment and supplies that were of no further use to the defendant without threat to his employment status. Plaintiff was entitled to rely, and did rely, on said policy...." The complaint describes the nature of Dr. Paul's reliance. At no time does it ever use the term "equitable estoppel." Yet for some reason the trial court affixed this legal term of art to the doctor's claim. Equitable estoppel or estoppel in pais is a defense used to preclude a person from denying or asserting a claim. Its elements are: (1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel. *Stolarick v. Stolarick*, 241 Pa.Super. 498, 509, 363 A.2d 793, 799 (1976).

A plaintiff may assert that a defendant is estopped from raising a particular defense. In *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa.Super. 307, 369 A.2d 416 (1976), this court applied the doctrine of equitable estoppel to foreclose a putative father from denying paternity. The defendant had married a woman who was pregnant with another man's child. During the marriage he treated the child as if he were her natural father. After separation from his wife, the defendant claimed that he did not owe the child any duty of support because he was not her father. To prove his claim, he offered blood test results which conclusively demonstrated that he was not the child's father. The superior court held that he was estopped from introducing proof of this defense. The court stated that the defendant had indicated by his conduct that he was the child's father. *Id.*, 245 Pa.Superior Ct. at 312, 369 A.2d at 418. The child had reasonably relied on this representation in that he had extended love and affection to the defendant. Therefore, the defendant was precluded from raising lack of paternity as a defense to the support action. The court concluded that "equitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previ-

ously taken." *Id.*, 245 Pa.Superior Ct. at 311, 369 A.2d at 418.

Equitable estoppel may also be pled as an affirmative defense. In *Stolarick*, the holder of a right of reentry upon a parcel of land brought a petition for declaratory judgment seeking interpretation of certain deed provisions. The defendants argued that the plaintiff was estopped from raising her claim because she had misled the defendants into believing that she had no interest in the land. 241 Pa.Super. at 509, 363 A.2d at 799. The court recognized that estoppel may be pled as an affirmative defense but decided that the elements were not supported by the facts of the case. *Id.*

Thus, equitable estoppel is not an independent cause of action. It may be used as an affirmative defense or a plaintiff may use it to preclude a defense from being raised. It may prove useful during litigation, but it is ancillary by nature. Though it may aid a party in recovering upon his legal theory, it may not serve as a substitute for such a theory.

The doctrine of promissory estoppel is an outgrowth of equitable estoppel but the two are separate and distinct principles. Promissory estoppel, unlike its equitable cousin, may serve as an independent cause of action. *Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 74, 384 A.2d 1228, 1233 (1978). The doctrine allows courts to enforce promises unsupported by consideration in order to remedy a manifest injustice. *Id.* The cause of action is made out where the asserted promise is such that: (1) the promisor should reasonably expect to induce a definite action or forbearance on the part of the promisee; (2) it actually induces such action or forbearance; and (3) injustice can be avoided only by its enforcement. *Id.*

As noted above, when a defendant relies on equitable estoppel, the doctrine will usually be employed as an affirmative defense. *Straup v. Times Herald*, 283 Pa.Super. 58, 69, 423 A.2d 713, 719 (1980). The defendant in such a case

will generally assert that even if the plaintiff's claims are true, he is barred from recovery because of the estoppel. In Pennsylvania, an affirmative defense must be specifically raised in the pleadings or it is waived. *Id.; see* Pa.R.C.P. 1030, 1032. However, a plaintiff who attempts to recover upon a promise on the basis of estoppel need not attach any particular label to his claim. *Straup*, 283 Pa.Super. at 70, 423 A.2d at 719. The issue is preserved for appellate review as long as the plaintiff's basic contention involves a promise and reasonable and detrimental reliance. *Id.*

Dr. Paul articulated such a claim in his complaint, at trial, and on appeal. Though he failed to distinguish equitable from promissory estoppel, *Straup* demonstrates that this is a common failing. We see no reason, then, to deny him relief on the grounds that he has confused his theories of estoppel.

We are more concerned with Footnote 12 in *Banas*, *supra*. In that case, an employee was terminated for making a personal item on company time. An employee handbook distributed to employees allowed them to make personal items with the permission of their supervisors. Although the plaintiff in that case had ostensibly received permission, he was terminated for violation of company policy, that is, for making a grave marker for personal use. *Id.* 348 Pa.Super. at 485, 502 A.2d at 648. In Footnote 12, this court discussed the question of promissory estoppel as applicable to the case:

> The trial court instructed the jury that a "contract by estoppel" might be found if the jury concluded that appellant had received permission to make the grave marker. The court may have had the doctrine of promissory estoppel in mind when it gave its instruction. While our courts have applied that doctrine when *consideration* for a promise is absent, ... the doctrine does not provide a basis for relief when, as is the case here, a *promise* is absent. It has been suggested that the doctrine of promissory estoppel may provide a basis for an employee's recovery for commitments made in an employee hand-

book.... We are not persuaded by the suggestion. Recovery on the theory of promissory estoppel, is ordinarily limited to recovery of amounts lost and expended in reliance on the promise, ... in order to place the plaintiff in the position he would have occupied had the promise never been made.... In addition, the question arises whether any reliance on the asserted promise was justified. If the employer has placed no limit on its freedom of action, the promise would seem illusory only.

*Id.*, 348 Pa.Superior Ct. at 486 n. 12, 502 A.2d at 648 n. 12 (citations omitted). Neither *Banas*, nor its footnote, have any applicability here.

In *Banas*, the employee had exceeded the scope of his permission. The employee made a grave marker in his employer's shop and placed it on a grave in a cemetery without purchasing it through the cemetery, a customer of the employer. This was a conflict with Banas's duty to the employer. In the present case, the jury found that Paul had permission to take the material in question, and they could have concluded that he originally intended to utilize that equipment for a charitable purpose which provided neither benefit to him nor harm to his employer.

In addition to this factual distinction, we find that *Banas* differs intrinsically from the instant case. This court stated in *Banas* that the fact that the jury found that the employee had permission from a supervisor to make a personal item made no difference to the outcome of the case. The employee had based his claim upon a handbook. This court held that that handbook could not constitute a promise upon which he could have reasonably relied because it did not include an explicit just cause provision. "Given the jury's verdict, we may take it as fact that Campbell did give permission. But that fact is irrelevant. Appellant's handbook nowhere provided that an employee would be dismissed *only if the facts warranted it. If* the handbook had contained, if not expressly at least by clear implication, a just cause provision, *then* appellee's claim might have mer-

it." *Id.*, 348 Pa.Superior Ct. at 484–85, 502 A.2d at 647 (emphasis in the original).

What was missing in *Banas* is not missing here. We are not faced with an at-will situation in which an employer could not reasonably believe that his employee would rely upon a promise. Nor are we faced here with a vague employee handbook which hints at just cause and which the fact-finder held could not reasonably be relied upon by the employee. Here the jury expressly found that a promise existed, and that Paul justifiably relied upon that promise. Moreover, the promise on which he relied was not a broad guarantee to fire Paul only for just cause, but the limited promise, through the grant of permission to Paul to remove the equipment, that he would not be fired for doing so. Obviously, the employer was free to fire him for any other reason.

▆ Applying the *Cardamone* test to this case, we find that appellant did put forth a cause of action for promissory estoppel. Clearly the jury found that Lankenau made a promise which it should reasonably have expected to induce a definite action or forbearance by Paul. Pursuant to the interrogatories submitted by the trial judge, the jury found that the hospital had represented that the doctor had permission to take the equipment. To say that Paul was implicitly promised that he would not be terminated for exercising that permission is merely to restate these findings. The latter proposition follows logically from the former.

Further, we do not see that having made such a promise, Lankenau can, in good faith, argue that Paul did not justifiably rely upon its representation. The jury found that Lankenau gave its permission. Lankenau cannot then withdraw that permission when and if it pleases in order to suit itself. Paul had been given permission, and had relied upon that permission over a period of ten years. Under these circumstances, a jury could reasonably have concluded that Paul's reliance was entitled to legal protection. We do not

find that the trial court erred in failing to grant Lankenau's motion for judgment n.o.v.

The final requirement for recovery under *Cardamone,* is a showing that injustice can be avoided only by enforcement of the promise. *Cardamone,* 253 Pa.Super. at 74, 384 A.2d at 1233. Paul has satisfied that requirement. The jury found that Lankenau Hospital did not act in good faith. Further, it revolts both logic and common sense, as well as one's sense of justice, that an employee can be discharged for exercising the permission given to him by an employer. The at-will employment doctrine provides that an employer may discharge, for any reason whatsoever, an employee who has no contract for a set period of employment for any reason whatsoever. That doctrine was designed to allow employers freedom in operating a business. We do not see the need to transform it into an implement through which the employer can fashion snares for the unsuspecting employee. To allow employers who already have the benefit of the at-will employment doctrine to terminate their employees for exercising permission given to them would be to allow an abuse of power. The situation is too similar to shooting fish in a barrel.

An examination of Dr. Paul's claims centers on the question of whether the trial court properly granted Lankenau's motion for nonsuits on the public policy, intentional infliction of emotional distress, defamation, and implied contract counts. A nonsuit may be entered only where the facts absolutely establish the absence of liability, and any conflicts in the evidence must be resolved in the plaintiff's favor. *Griffin v. Tedesco,* 355 Pa.Super. 475, 479, 513 A.2d 1020, 1022 (1986).

Paul argues that his termination was in violation of public policy. The courts of this Commonwealth have long recognized that employers have the right to discharge employees who have no definite contract of employment at any time and for any reason. *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974); *Henry v. Pittsburgh & L.E.R.R.,* 139 Pa. 289, 21 A. 157 (1891). Exceptions to that

somewhat harsh rule have developed to mitigate its effects. *See Veno v. Meredith,* 357 Pa.Super. 85, 515 A.2d 571 (1986) (additional consideration given the employer by the employee removes the case from the at-will doctrine); *Greene v. Oliver Realty Co.,* 363 Pa.Super. 534, 526 A.2d 1192 (1987) (implied contract will exist where an employee handbook explicitly states that discharge will be for just cause only). One such exception recognized in Pennsylvania is the public policy exception.

Under the public policy exception, an employee who can show that his discharge violated public policy and that there was no legitimate and plausible reason for that termination can make out a cause of action despite his at-will status. *Cisco v. United Parcel Service,* 328 Pa.Super. 300, 303, 476 A.2d 1340, 1341 (1984); *Yaindl v. Ingersoll–Rand Co.,* 281 Pa.Super. 560, 571, 422 A.2d 611, 617 (1980). This court, however, has found that exception to be a narrow one, *Martin v. Capital Cities, Inc.,* 354 Pa.Super. 199, 222, 511 A.2d 830, 842 (1986), closely bounded by the employer's right to run his business as he sees fit. *See Turner v. Letterkenny Federal Credit Union,* 351 Pa.Super. 51, 55, 505 A.2d 259, 261 (1985); *Yaindl,* 281 Pa.Super. at 577, 422 A.2d at 620. Appellant must show that there has been a "violation of a clearly mandated public policy which 'strikes at the heart of a citizen's social right, duties, and responsibilities,'" *Turner,* 351 Pa.Super. at 55, 505 A.2d at 261 (quoting *Novosel v. Nationwide Ins. Co.,* 721 F.2d 894, 899 (3rd Cir.1983)).

This court has recognized the public policy exception in only two published cases since *Geary v. United States Steel Corp.* was decided in 1974. In *Hunter v. Port Authority,* 277 Pa.Super. 4, 419 A.2d 631 (1980), we held that an employee convicted of assault and pardoned by the governor had made out a cause of action in wrongful discharge although he was an at-will employee. This court held that there was an established public policy against stigmatizing former offenders. *Id.,* 277 Pa.Superior Ct. at 11, 419 A.2d at 635. In *Reuther v. Fowler & Williams,*

*Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978), we again found that the employee had made out a cause of action in wrongful discharge. In that case, the employee was discharged either because he failed to inform his employer that he would be absent due to jury duty, or because he had jury duty. We held that under the second theory, damages would be recoverable because of the strong public policy of promoting the responsibility of performing jury duty. *Id.*, 255 Pa.Superior Ct. at 33–34, 386 A.2d at 121. In this case, Paul has made no argument that would lead us to the conclusion that any important and specific public policy has been violated.

Paul does point to a series of criminal statutes that he claims are statements of public policy. According to Paul, when Lankenau discharged him, it committed the offenses of criminal coercion and compounding. *See* 18 Pa.C.S. §§ 2906, 5108. We do not find, however, that the statutes cited by Paul evince any public policy against firing an employee that the employer decides it no longer wishes to employ. In fact, in *Gillespie v. St. Joseph's University*, 355 Pa.Super. 362, 513 A.2d 471 (1986), this court stated that no public policy existed against firing an employee who had been accused of a crime of dishonesty even though those charges proved to be false. *Id.*, 355 Pa.Superior Ct. at 364–65, 513 A.2d at 473.

Paul also argues that his discharge violated a public policy against abusive terminations. According to Paul, this policy was recognized by our court in *Yaindl v. Ingersoll–Rand Co., supra.* We find that Paul has misinterpreted the public policy exception as it exists in this Commonwealth.

In discussing that exception, we must return to the seminal case of *Geary v. United States Steel Corp., supra.* In *Geary,* the Pennsylvania Supreme Court, in upholding the at-will doctrine, recognized two possible exceptions. First, the court referred to a claim that a cause of action might be based on the employer's motive. As to this, the court stated, "[T]he novel theory of recovery which appel-

lant advances must surely involve specific intent on the part of the company to harm Geary or achieve some other proscribed goal." *Geary*, 456 Pa. at 178, 319 A.2d at 177. The court added that comparison to cases involving the malicious use of recognized rights might be apt, and noted that in such a case the recitation that the defendant had acted "intentionally, wrongfully, maliciously, fraudulently, deceitfully and without justification" did not satisfy the specific intent to harm requirement. *Id.*, 456 Pa.Superior Ct. at 179, 319 A.2d at 178. In analyzing the facts of the case, the court in *Geary* concluded that there was no basis on which to infer that Geary was fired for the specific intent of causing him harm and added that the claim showed no basis for a finding of "ulterior purpose" or "disinterested malevolence" in the act of dismissal. *Id.*, 456 Pa.Superior Ct. at 180, 319 A.2d at 178 (citing to *American Bank and Trust Co. v. Federal Reserve Bank*, 256 U.S. 350, 41 S.Ct. 499, 65 L.Ed. 983 (1921)).

The court addressed separately the argument that the discharge violated public policy and rejected Geary's claim that his discharge was excepted from the at-will doctrine by this theory. Although the court found that no exception to the doctrine at-will employment had been made out, it did recognize that two exceptions to that doctrine might exist, and treated specific intent to harm and violation of a clear mandate of public policy as separate exceptions.

Paul argues that his discharge was based on a violation of public policy, yet bases his reasoning on his having made a sufficient showing of disinterested malevolence and ulterior purpose to survive the nonsuit. These descriptions apply to the specific intent to harm exception, rather than the public policy exception. It appears that the misappropriation of the disinterested malevolence/ulterior motive language into the public policy exception began with a suggestion expressed as dicta in a footnote in Judge Spaeth's opinion in *Yaindl, supra*. In that footnote, he opined that a discharge carried out with specific intent to harm is an example of a violation of public policy. *Yaindl*, 281 Pa.Su-

per. at 573 n. 5, 422 A.2d at 615 n. 5. In view of *Geary's* treatment of these two exceptions and its discussion indicating that specific intent to harm was required only in one, this would seem to be in error.[1] Further, when a panel of this court attempted the analysis of public policy and specific intent to harm in *Tourville v. Inter-Ocean Ins. Co.*, 353 Pa.Super. 53, 508 A.2d 1263 (1986), it noted that the definition of "specific intent to harm" was able to stand alone, regardless of whether one viewed the two *Geary* exceptions as separate and distinct, or whether one considered specific intent to harm as violative of public policy. We now recognize that the two exceptions are separate and distinct from one another.

In any case, even supposing that Paul had made an argument under the theory of specific intent to harm, he has not shown employer conduct that rises to the level of malicious conduct required under this doctrine. At best, he could show that he was removed because Lankenau believed that he took the refrigerators without permission. Discharge based on such a motivation is conduct which is neither malevolent nor demonstrative of an ulterior purpose. *See Tourville, supra.*

It must be remembered that *Geary v. United States Steel, supra,* plainly delineated the application of the public policy exception to the at-will employment doctrine when it provided that a right of action will adhere only when a "clear mandate of public policy is violated." *Geary,* 456 Pa. at 184–85, 319 A.2d at 180. This strict limitation of the public policy exception is necessary; if we were to allow a broad application of the public policy exception, the at-will employment doctrine would almost certainly be dismembered by individual judicial notions of what constitutes the public weal.

---

1. The opinion writer in *Yaindl* later noted that a commentator had read the decision too broadly and that it was not meant to imply a just cause requirement into employment contracts. *Banas,* 348 Pa.Super. at 480, 502 A.2d at 645. The commentator had found *Yaindl's* reading of the public policy exception to be expansive. *See* Comment, *The Role of Federal Courts in Changing State Law: The Employment at Will Doctrine in Pennsylvania,* 133 U.Pa.L.Rev. 227 (1984).

Similarly, Dr. Paul's count for implied contract was properly nonsuited. The at-will presumption may be rebutted by clear evidence of an implied contract based upon the circumstances surrounding the employment. *Greene,* 363 Pa.Super. at 554, 526 A.2d at 1202. Dr. Paul alleged that the hospital impliedly promised he would be fired only for "just cause." He presented evidence that: he was the intended beneficiary of several research grants; the medical staff by-laws established a policy of just cause dismissals only; the hospital's actual practice was to dismiss for just cause only; and Dr. Paul had given his employer various items constituting "additional consideration" including a $7,000 infant intensive care unit. These factors cannot be said to be sufficient to characterize Paul's position as anything other than employment at will. *See Ross v. Montour Railroad Co.,* 357 Pa.Super. 376, 516 A.2d 29 (1986) (employee contentions of additional consideration, employer custom, practice, and policy not sufficient to create a contract for employment); *accord Adams v. Budd Co.,* 583 F.Supp. 711 (E.D.Pa.1984). The courts of this Commonwealth have long required a more specific and express showing of intent to create an employment contract before an employee can escape at-will status. *See, e.g., Martin v. Capital Cities Media, Inc., supra,* (employee handbook describing employee discipline in terms of "just cause" not sufficient to change status of at-will employee); *Reilly v. Stroehmann Bros. Co.,* 367 Pa.Super. 411, 532 A.2d 1212 (1987) (court rejected claim that published arbitration provisions relating to discharge were impliedly incorporated into employment contract).

■ There is no basis for expanding Paul's membership on the medical staff into a contract for employment in the Research Department. They are distinct. The evidence showed that the medical staff is an organization of licensed physicians and dentists practicing at the hospital for the purpose of monitoring medical care. Its by-laws regulate clinical privileges and organization of the medical staff. They do not purport to grant or regulate employment rights

at the hospital. If Paul had any claim as a result of his not being reappointed to the medical staff, it would not affect his employment rights and salary, which are the basis of his present action. As to those issues, since he was not a licensed physician, he did not have staff privileges. Further, the record demonstrates that Paul's membership on the medical staff was not revoked, but rather that he was not reappointed when his appointment lapsed in 1981. This was at a time when he was no longer in the Department of Research, and, therefore, was ineligible for reappointment to the medical staff.

■ Finally, the argument that Paul had given Lankenau "additional consideration," including a $7000 infant intensive care unit, which a jury could find was sufficient to create an implied contract of employment, is meritless. There is simply no nexus between any alleged gifts and his status as an employee. The mutuality of a *good* employer/employee relationship is such that the parties will often confer benefits on each other, but such an exchange cannot be said to impliedly grant an employment contract to an employee at will in every instance. We will therefore uphold the trial court's grant of a nonsuit on Paul's public policy and implied contract claims.

■ We would, however, grant a new trial on his defamation claim. Considering the evidence presented by Paul in support of that claim, the trial court should also have allowed this claim to go to the jury on the question of abuse of privilege. "Communications made on a proper occasion, from a proper motive, in a proper manner, and based upon reasonable cause are privileged." *Beckman v. Dunn*, 276 Pa.Super. 527, 536, 419 A.2d 583, 587 (1980). Proper occasion arises when one of three types of interests is involved: (1) an interest of the person who publishes the defamatory matter; (2) an interest of the person to whom the matter is published; or (3) a recognized public interest. *Id.*, 276 Pa.Superior Ct. at 536, 419 A.2d at 588. If the communication is made to third persons without such a legitimate interest, if it includes matter not deemed to be necessary

for the purposes of the privilege, if it is made for a purpose other than that for which the privilege is given, or if it is actuated at least by negligence, *see Geyer v. Steinbronn,* 351 Pa.Super. 536, 551, 506 A.2d 901, 909 (1986), the privilege is deemed abused and liability may be determined under traditional defamation principles.

While the question of whether a privilege applies in a given case is for the judge to determine, the question of whether or not that privilege has been abused is a matter for the jury's consideration. *Agriss v. Roadway Express, Inc.,* 334 Pa.Super. 295, 309, 483 A.2d 456, 463 (1984). In the instant case, the court could reasonably have found from the evidence that the privilege applied. It is not certain from the evidence, however, that a jury could have made the determination that the privilege was not abused. Under Pennsylvania law, the dismissal of an innocent employee for theft could constitute a communication that that employee was a thief, and support a cause of action for defamation. *See Berg v. Consolidated Freightways,* 280 Pa.Super. 495, 501 n. 1, 421 A.2d 831, 834 n. 1 (1980) ("Whether mere conduct alone, in absence of any verbal communication, would support a suit in slander is a question better left to a case involving precisely those facts. Suffice it to say that in view of our holding, it could be difficult to argue against it.").

In this case, regardless of whether Lankenau did or did not communicate verbally with any unprivileged employee regarding Paul's discharge, his termination could have served as an injury to reputation and could have been subject to a defamatory construction. A jury question was then created as to whether or not recipients of the communication could have understood it to be defamatory. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273 A.2d 899, 904 (1971). Since it is far from certain that they would not, the nonsuit was improper.

Further, if the jury could have found that Lankenau acted negligently in discharging Paul, that is, with negligent disregard for whether the communication—the discharge—

implied true or false circumstances, any privilege Lankenau might have had to inform other employees concerned in the event of the discharge would have been abused. Paul introduced evidence that when he was confronted with his alleged "theft," he stated that he had permission to take the equipment. Whether Lankenau acted reasonably in investigating the truth or falsity of this statement was a question of fact for the jury to decide.

■ Finally, appellant argues that his claim for intentional infliction of emotional distress was improperly nonsuited. We disagree, and uphold the trial court's decision on this issue. It is well settled in Pennsylvania that a cause of action for intentional infliction of emotional distress is made out where the conduct in question is "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community...." *Jones v. Nissenbaum, Rudolph & Seidner*, 244 Pa.Super. 377, 383, 368 A.2d 770, 773 (1976) (quoting Restatement (Second) of Torts § 46, comment d (1965)). "It is apparent that the gravamen of this tort is that the conduct complained of must be of an extreme or outrageous type." *Id; see also Banyas v. Lower Bucks Hosp.*, 293 Pa.Super. 122, 126, 437 A.2d 1236, 1238 (1981). Appellant argues merely that Lankenau's conduct was outrageous because he was terminated after ten years. We do not find this action to be the outrageous conduct for which Pennsylvania courts have held defendants liable in tort for intentional infliction of emotional distress. A cause of action has been held to exist only in limited circumstances, where the conduct has been clearly outrageous, as in *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970), where defendants were held liable in tort for withholding the body of a deceased child from its parents for two months. Paul's discharge does not rise to this level.

Further, we note that Paul's claim fails under the recent supreme court decision of *Kazatsky v. King David Memorial Park*, 515 Pa. 183, 527 A.2d 988 (1987). In that case,

our supreme court declined to address the question of whether or not the cause of action for intentional infliction of emotional distress as outlined in the Restatement Second of Torts should be adopted in this Commonwealth. The court, however, went on to say that even if the Restatement should be adopted, appellant had failed to make out a claim. The court held that a plaintiff must present competent medical evidence of his emotional distress in order to make out a claim for intentional infliction of emotional distress under the Restatement. *Id.*, 515 Pa. at 197, 527 A.2d at 995. We hold that the nonsuit was proper here under the court's reasoning in *Kazatsky* because Paul has failed to present sufficient competent medical evidence.

██ Because we have held that the decision of the trial court should be affirmed in part, and that appellant was properly awarded damages for his estoppel claim, we must address the issue of damages in this case. The trial court found that the jury's award of $410,000 was excessive in view of appellant's status as an at-will employee, even though Lankenau had acted wrongly in discharging him for removing the equipment. The trial court was concerned that in awarding the appellant the amount that it did, the jury, in effect, was awarding appellant an annuity for life and putting Paul in a position better than that he would have had if Lankenau's promise had been performed. We are persuaded by the reasoning of the learned trial judge. In this case we find that the remittitur was indeed proper to prevent Paul from receiving a windfall.

Because we would find that the jury was adequately charged on the estoppel theory of the case regardless of the fact that the trial court failed to use precise terminology, and that the jury's findings do support a verdict for appellant Paul on that theory, we affirm the verdict of the trial court on that count. Further, we affirm the trial court's remittitur. We also uphold the trial court's grant of a nonsuit on the issues of public policy, implied contract, and intentional infliction of emotional distress. Because we do hold, however, that the trial court should have charged the

jury on Dr. Paul's defamation claim, this case is remanded for a new trial on that count.

Affirmed in part and reversed and remanded in part for a new trial on the issue of defamation.

CAVANAUGH, J., files a dissenting opinion.

McEWEN, J., files a concurring and dissenting statement.

BECK, J., files a concurring and dissenting opinion in which DEL SOLE, J., joins.

CAVANAUGH, Judge, dissenting:

I dissent because I believe that the majority opinion substantially abrogates the employment at-will doctrine in Pennsylvania and is contrary to established precedent.

## THE JOB SECURITY RIGHTS OF AN EMPLOYEE–AT–WILL

The law of Pennsylvania has long been that there is, generally speaking, no cause of action for dismissal of an employee at will.[1] Unless protected by a labor contract or an employment contract from an employer's absolute right to discharge employees, an employee is considered an employee-at-will and he may be discharged at any time for any or no reason whatsoever. Dismissal for non-protected rights of one in this status is simply not justiciable. This rule is deeply entrenched in our law. While on its face the rule appears harsh—one recoils at the thought of a long-term faithful employee being suddenly turned out at the employer's whim—it is undoubtedly rooted in the feeling that job security must be a bargained-for employee benefit and that the employee at-will doctrine is merely the reverse of the accepted tenet that an employee may choose to separate from this employment at any time he wishes short of a specific agreement to the contrary. Moreover, one

---

1. The exceptions are if the discharge was made with a specific intent to harm or is contrary to clear mandate of public policy. *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974).

would expect that an employer's willingness to hire person-
nel and to locate or expand an enterprise within the Com-
monwealth would be encouraged by the knowledge that,
short of an agreement to the contrary, an employee, once
hired, may be discharged without reason. It is probably not
too much to say that this doctrine is vitally ingrained into
the entire social and economic structure of this Common-
wealth.

It is for these reasons that cases dealing with claims
involving alleged wrongful discharge are of great impor-
tance and must be given careful scrutiny. It is for these
reasons that any "development" in the law of wrongful
discharge should come as the result of careful and thorough
legislative review and action or, if change be by judicial
decision, it must come from the highest court in the Com-
monwealth.

All of this is, of course, not to say that employers or
employees may act with impunity in their conduct with each
other. Thus, an employee who has a cognizable common-
law tort, civil or equitable claim (other than a claim within
the purview of the Workmen's Compensation Act) may
pursue that claim in the courts of this Commonwealth.
However, it is important that an impermissible wrongful
discharge action not withstand judicial scrutiny merely be-
cause it enters the courthouse marked as a claim under
another label. The case of a cognizable wrongful discharge
claim such as an employee with a contract is that the
employer has, without acceptable cause, separated the
plaintiff from his employment, whereas in other tort claims,
say one in defamation, the fact of employment with the
defendant-employer is only incidental to the cause of action.
Moreover, the damages in a cognizable wrongful discharge
case and in another action may at least in part be similar.
Thus, if A is defamed by B, he may claim that as part of his
damages he was caused to lose his job with C. Similarly, if
A is defamed by B and B is also A's employer, B should not
be permitted to claim that there is any immunity from
damages for impairment of earning capacity merely be-

cause A was an employee-at-will. Rather, the separation from employment may be considered by the jury in the overall question of defamation damages.

It is perhaps because the employer-employee relationship is one of grave economic and social implication, and, in keeping with our tradition of liberty, is one grounded on a concept of mutual consent, that the employment relationship has historically been treated differently from other contractual relations. We have previously commented on this aspect of the law:

> The at-will rule had become so firmly entrenched by 1915 that our Supreme Court quoted with approval Professor Labbat's work on Master and Servant relations. "The preponderance of American authority in favor of the doctrine that an indefinite hiring is presumptively a hiring at will is so great that it is now scarcely open to criticism." *Hogle v. DeLong Hook & Eye Co.*, 248 Pa. 471, 94 A. 190 (1915) (quoting 1 C. Labatt, Master and Servant § 160 at 519 (1913)). The rule has since been reaffirmed so often that it defies citation.

> The rationale justifying the employment at-will rule has been described as follows:

> "Professor Farnsworth, reporter to the Restatement (Second) of Contracts, has succinctly stated:

> 'Conscious of the traditionally intimate nature of the relationship between employer and employee, courts have regularly found that [there is no language in the contract relevant to termination of the employee] despite absolute promises on both sides. Then by implication, they have almost invariably supplied a term allowing either party to terminate at will.'

> E.A. Farnsworth, *Contracts* 532 (1982) (emphasis added).

> "The at-will rule is a legal recognition of the 'intimate nature' of the master-servant relationship of which professor Farnsworth wrote, *supra*. In contrast to the employment setting, consider a sales relationship where a consumer purchases an appliance. It matters not at

all whether the consumer and manufacturer get along personally. They usually never even meet. Whereas, it is often crucial to the employment relationship that the parties work well together and trust one another. Because so much depends on the subjective satisfaction of both parties in this area, the law is reluctant to require either to articulate objective 'just cause' reasons when either decides to sever the relationship. The at-will rule is an articulation of this reluctance. Moreover, the employment relationship is often more complex than other types of contractual relationships. In the case of the sale of an appliance, both buyer and seller can readily articulate objective reasons they might have for dissatisfaction with the other. The seller will be justifiably dissatisfied if the buyer's check bounces. The buyer will be justifiably unhappy if the product fails to perform to his reasonable expectations. In the employment setting, it may be impossible for either party to state with objective clarity the reasons for his dissatisfaction with the other. (The dissatisfaction may be borne of an accumulation of seemingly trivial things.) However, the law, via the at-will rule, recognizes that this dissatisfaction is as deserving of judicial relief as that in any other contractual setting: *Martin v. Capital Cities Media, Inc. supra,* [354 Pa. Super 199] 511 A.2d [830] at 837 [1986].

*Veno v. Meredith,* 357 Pa.Super. 85, 95–96, n. 1, 515 A.2d 571, 576, 577, n. 1. (1986).

## THE ESTOPPEL CLAIM

We turn first to the estoppel claim. The majority in this case affirms the reduced verdict on the basis that the recovery is supported under the claim of promissory estoppel. We will assume that it is proper for an appellate court to enunciate and articulate the legal foundation for a claim in a way that was not espoused by the plaintiff at trial nor

discussed by the court below.[2] We will assume this even though the majority states that Paul proceeded in his complaint at trial and on appeal on a general estoppel theory and failed to distinguish equitable estoppel from promissory estoppel (thus allowing this court to select either theory). The fact, however, is that in his brief before this court en banc Paul argues strenuously that the theory supporting his recovery is equitable estoppel and *not* promissory estoppel thus arguing *against* the theory upon which the majority affirms the award.

The majority draws a distinction between equitable estoppel (which may, during the course of litigation, be raised by either party to preclude the other party from denying or asserting a claim) and promissory estoppel. Promissory estoppel is the same legal tool put to use as the basis of a cause of action, rather than being ancillary to the assertion of another cause of action. Thus, it would be equitable estoppel if Paul used the promise of the refrigerators as a defense to a claim by the hospital for the return of the refrigerators, or, if Paul, had a just cause employment contract that he asserted was breached by his separation from employment, and used the promise to a defense asserted by the hospital that there was good cause for his discharge. Rather, the estoppel here is not ancillary to another cause of action, but is the actual gravamen of the cause of action. The jury found that a lower level employee, David D'Urbanis, supervisor of a supply storeroom, gave permission to Paul to take the refrigerators (which Paul later advertised and sold from his house). Promissory estoppel is an extraordinary doctrine in that it may be employed to enforce a promise unsupported by considera-

2. *But see Ross v. Montour Railroad Co.,* 357 Pa.Super. 376, 516 A.2d 29 (1986) a suit for breach of employment contract and wrongful discharge from employment where we stated:

We note that appellant has presented evidence of detrimental reliance on the promise, however, he has not argued or pled a theory of promissory estoppel and we cannot raise it for him.

357 Pa.Super. at 381, n. 1, 516 A.2d at 31, n. 1.

tion in order to avoid a manifest injustice. *See Utility Appliance Corp. v. Kuhns*, 393 Pa. 414, 143 A.2d 35 (1958). It is most important to recognize, as I submit, the majority has failed to do, that promissory estoppel makes a promise binding if injustice can be avoided only by *enforcement of the promise. Restatement, Second, Contracts* § 90. The only modification of this remedy recognized by the *Restatement* is a recognition of the possibility of partial enforcement. *Restatement, Second, Contracts* § 90 and *Reporters Note.* Pennsylvania cases applying the so called promissory estoppel doctrine are limited to enforcement of the promise. *Berliner v. Bee Em Manufacturing Co.*, 383 Pa. 458, 119 A.2d 65 (1956); *Fried v. Fisher*, 328 Pa. 497, 196 A. 39 (1938); *Robert Mallery Lumber v. B & F Associates*, 294 Pa.Super. 503, 440 A.2d 579 (1982); *Straup v. Times Herald*, 283 Pa.Super. 58, 423 A.2d 713 (1980); *Langer v. Superior Steel Corp.*, 105 Pa.Super. 579, 161 A. 571 (1932); *Green v. Interstate United Management Services Corp.*, 748 F.2d 827 (3rd Cir.1984). Fair enough, if the suit was by Paul to get or retain the refrigerators his claim of promissory estoppel, believed by the jury, is sufficient for him to prevail. However, the crux of the cause of action can only be the refrigerators in question and their entitlement.[3] The majority, however, by reason of its finding, elevates Paul from his incontestable position as an employee at will to one who may be discharged only for cause and proceeds to affirm the award of substantial wrongful discharge damages. To justify such a result under the promissory estoppel theory the jury, I submit, would have to have found that D'Urbanis promised Paul that he could have the refrigerators and *in addition* advised him that he was also authorized by management to tell Paul that he has been elevated from his status as an at-will employee, and that henceforth

---

3. In *Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985) (en banc) we noted in f.n. 12 with respect to promissory estoppel that "Recovery on the theory of promissory estoppel is ordinarily limited to recovery of amounts lost and expended on the promise in order to place the plaintiff in the position he would have occupied had the promise never been made." (Citations omitted.)

he could only be discharged from Lankenau upon a showing of just cause.

Our courts have adhered to the principle that the discharge of an employee-at-will generally will not be reviewed in a judicial forum and, therefore, the threshold question in any given case is whether or not the employment was at-will. This is the analysis that our court (en banc) undertook in *Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 502 A.2d 637 (1985). Before comparing *Banas*, which was an employee suit based on breach of contract, it is important to recall that in our case the "estoppel" claim by Paul (analyzed by the majority to have been a promissory estoppel claim) was not for entitlement to the five refrigerators, but sought damages for his loss of employment. Thus, though designated a cause of action in estoppel, the suit sought (and received) a jury verdict for damages arising out of his discharge from Lankenau. Thus, the majority decision is in direct conflict with *Banas*. Mr. Banas, an employee, was discharged for using his employer's supplies and equipment to make a grave marker. The employee claimed that he had permission to do the work and the employer denied that he had permission. The jury found that the employee did have permission, but our court denied relief for damages arising out of discharge finding that the fact that the employee had permission to do what he did was irrelevant since he was an employee-at-will and could be discharged for any or no reason.[4] We held,

> There is no merit to this argument. To be sure, according to *appellee,* and according to the *jury,* Campbell gave appellee permission to make the grave marker. But according to *appellant,* Campbell did *not* give permission. Given the jury's verdict, we may take it as fact that Campbell did give permission. But that fact is irrelevant. Appellant's handbook nowhere provided that an employee would be dismissed *only if the facts warranted it.*

.        .        .        .        .

---

**4.** The *Banas* court, as in the case sub judice, charged the jury on the issue of estoppel.

> As an employee-at-will, he could be dismissed, as he *was* dismissed, because *appellant believed* that he had made the grave marker without permission and knowing that to make it was against long-settled company policy. Whether appellant's belief was *correct* —i.e., in accordance with fact—has nothing to do with the case; that it has nothing to do with the case is of the essence of appellee's status as an employee-at-will, who may be dismissed "for any or no reason." *Geary v. United States Steel Corp., supra.*

*Banas v. Matthews,* 348 Pa.Super. at 484–486, 502 A.2d 637 at 647–648.

Similarly, in our case, Paul claimed and the jury agreed, that he had permission to take the refrigerators. He does not claim, nor could he, that he had an agreement from Lankenau to be dismissed *only if the facts warranted it.* He could (like Banas) be discharged whether or not his employer's belief was *correct,* since he could be dismissed for any reason or no reason. As in *Banas,* there is under the law no basis for the jury verdict since appellant was an employee-at-will. I submit that the majority decision in this case, in effect, overrules our en banc decision in *Banas* as it elevates an employee who acts in accordance with an employer's promise to the status of an employee with contractual rights in his continued employment.

## THE ATTEMPT TO DISTINGUISH BANAS

The majority's attempt to distinguish *Banas* is based on a serious misreading of that case. The majority differs *Banas* since in *Banas* "the employee had exceeded the scope of his permission (in making a grave marker)" whereas in the present case the jury found that Paul had permission to take the material in question and that he utilized it for a purpose which provided neither benefit to him nor harm to his employer. Since Paul advertised and sold the refrigerators for personal profit the "benefit" aspect of the majority's statement is plainly in error. More importantly, however, the majority makes a serious error in concluding, as a

distinguishing factor, that Banas, in making the marker, had exceeded his permission. This crucial conclusion is wrong. In *Banas* the jury found that Banas was correct in his allegation that his employee handbook and supervisors' assent gave him permission to make the grave marker. *See Banas* 502 A.2d at 647.

The majority's second basis for attempting to distinguish *Banas* is also patently in error. It is claimed that because Banas relied upon a handbook, the permission from a supervisor to make a grave marker made no difference to the outcome of the case. However, Banas' evidence accepted by the jury was that his handbook gave him permission to use the employer's equipment and waste materials for personal work *and* that his supervisor, Campbell, had given him permission to make the grave marker. Thus, the conclusion that somehow the *form* of the promise makes the difference and (questionably) that an oral promise conveyed to an employee is of greater efficacy than one conveyed in an employee handbook, is without foundation.

Finally, the majority concludes that while it is clear that Lankenau did not promise to fire Paul only for just cause "from its permission to Paul to remove the equipment, it promised not to fire him for removing the equipment." *Banas* sought the same relief and our court denied it to him since he was an employee at-will, but the present majority casts aside the deeply ingrained doctrine of the non-justiciability of dismissal of employees at will by concluding that one may be elevated to job security status by mere inference from the statement of a stockroom employee which did not purport, in any way, to deal with employee status.

## THE MAJORITY RESULT

The conclusion reached points up the legal incongruity to which the attempt to distinguish the sound reasoning of *Banas* has now lead. It is stated that "... from its permission to Paul to remove the equipment, it promised

not to fire him for removing the equipment. Obviously, it was free to fire him for any other reason." Thus, now given evidence of any employer's broken "promise" no matter how or by whom conveyed and believed by the jury to have been sufficient for estoppel, the jury may sit in judgment of any dismissal of the promised employee. Remarkably, as the majority concedes, the employer may still dismiss the employee for "any reason" (which, of course, may include ones which are good, bad or indifferent) or for no reason, but *not* for the unkept promise and this will be for the jury to decide.

Other cases where there has been a threshold determination that an employee is in an at-will status illustrate that we are not free to examine the "justice" of the job termination. In *Darlington v. General Electric*, 350 Pa.Super. 183, 504 A.2d 306 (1986), the court, after determining the at-will status of the employee, found that there could be no basis for recovery despite employee's good faith belief that he did not knowingly engage in expense account violations. In *Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571 (1986), once it was determined that the matter involved an employee-at-will, there was no basis for recovery even though the contention was that newspaper's managing editor was discharged wrongfully for publication of material. In *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986) an employee found to be in at-will status was not entitled to court review of her dismissal even though employee handbook provided for employee discipline for "just causes". It would appear that these cases and others would have been decided differently if presented under the expanded promissory estoppel theory which the majority creates. *See, e.g., Reilly v. Stroehmann Bros. Co.*, 367 Pa.Super. 411, 532 A.2d 1212 (1987); *Ross v. Montour Railroad Co.*, 357 Pa.Super. 376, 516 A.2d 29 (1986); *Betts v. Stroehmann Bros. Co.*, 355 Pa.Super. 195, 512 A.2d 1280 (1986); *Muscarella v. Milton Shoe Manufacturing Co., Inc.*, 352 Pa.Super. 158, 507 A.2d 430 (1986).

## DEFAMATION

It is clear that Paul has not stated a cause of action in defamation. There is no evidence that any publication of allegedly defamatory communication took place. This is the plaintiff's burden. 42 Pa.C.S.A. § 8343. Moreover, it is for the court to determine if a communication is capable of defamatory construction. *Veno v. Meredith, supra; Vitteck v. Washington Broadcasting Co.*, 256 Pa.Super. 427, 389 A.2d 1197 (1978). In addition, aside from lack of publication and no defamatory construction, if we were to accept Paul's resignation under pressure as the defamatory act, it is nothing more than an opinion—that Lankenau believed in good faith (D'Urbanis said he never gave Paul permission to take the refrigerator) that the refrigerators were taken by Paul without permission. *See Braig v. Field Communications*, 310 Pa.Super. 569, 456 A.2d 1366 (1983). There is no intimation of undisclosed defamatory facts. *Beckman v. Dunn*, 276 Pa.Super. 527, 419 A.2d 583 (1980).

Finally, *Berg v. Consolidated Freightways*, 280 Pa.Super. 495, 421 A.2d 831 (1980) is inapposite. In that case the theft investigation was, unlike the present case, publicized. Moreover, there were no arrests, and Lankenau did not communicate any reasons for Paul's resignation.

I would grant appellant Lankenau's motion for judgment N.O.V. and affirm the trial court's grant of nonsuit as to all other counts of the complaint.

McEWEN, Judge, concurring and dissenting:

The issues which confront this Court in this appeal are of such importance and difficulty that unanimity of view is understandably impossible. I can, however, afford to be succinct since my esteemed colleagues have so carefully and thoughtfully analyzed these complex and urgent issues. I am compelled to an expression, nonetheless, since I share the view of Judge Cavanaugh that judgment n.o.v. should have been entered on the promissory estoppel claim, while joining the opinion of President Judge Cirillo on all other issues.

BECK, Judge, concurring and dissenting:

I respectfully dissent from the majority decision to grant Dr. Paul a trial on his defamation claim. I concur in the result as to the remaining issues. I also write separately in order to explain why I believe that the majority's view of promissory estoppel is incompatible with *Banas v. Matthews International Corporation*, 348 Pa.Super. 464, 502 A.2d 637 (1985) (en banc), and why *Banas* should be expressly overruled.

## DEFAMATION

In any defamation action, the plaintiff must prove that the defendant published a defamatory communication. 42 Pa.Cons.Stat.Ann. § 8343 (Purdon 1982). The majority concludes that Lankenau's act of discharging Dr. Paul may be viewed as a defamatory communication that he was a thief. I disagree.

An employer does not defame an employee if he fires the employee after *privately* accusing him of a crime. *See Williams v. Kroger Grocery & Baking Co.*, 337 Pa. 17, 10 A.2d 8 (1940). Dr. Paul failed to introduce evidence that the management of Lankenau informed the hospital staff, prospective employers, or other third parties of the reason for his discharge. *Compare Geyer v. Steinbronn*, 351 Pa.Super. 536, 506 A.2d 901 (1986) (employer defamed plaintiff by circulating letter of reference which implied that plaintiff was forger); *Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 421 A.2d 831 (1980) (employer defamed plaintiff by forcing plaintiff to resign and then telling other workers that plaintiff was fired for stealing company property). Moreover, during the course of his employment, Lankenau had not publicized the allegations against Lr. Paul beyond the limited extent necessary to conduct an internal investigation. Under these circumstances, I would find that Lankenau did not publish any communication which was capable of a defamatory meaning.

## PROMISSORY ESTOPPEL

I agree with the majority that the award of damages to Dr. Paul should be upheld on the basis of promissory estoppel. However, I also believe that the majority should have expressly overruled the decision of this court in *Banas v. Matthews International Corporation*, 348 Pa.Super. 464, 502 A.2d 637 (1985) (en banc). *Banas* cannot be meaningfully distinguished from the case sub judice.

In *Banas*, the plaintiff was an employee-at-will who worked for a company which manufactured grave markers. Plaintiff Banas received direct permission from his immediate supervisor to build a grave marker from company owned materials and place it on his nephew's grave. Banas had also received a handbook, distributed by his employer, which stated that supervisors will often cooperate with employees by giving permission to use company equipment for personal work. He was then fired for doing exactly what he had been given permission to do. Banas filed suit against his employer for breach of contract. At trial, the judge instructed the jury that a "contract by estoppel" might be found if the jury concluded that Banas had permission to make the grave marker. 348 Pa.Super. at 486 n. 12, 502 A.2d 648 n. 12. The jury returned a verdict of $10,000 for the breach of contract claim. On appeal, Superior Court en banc reversed.

A careful reading of *Banas* indicates that in *Banas*, as in the instant case, permission was derived from the employer and the employer should have reasonably believed that his promise connoted to his employee that he had permission to act. It is also clear that both Banas and Dr. Paul relied on a promise and acted in accordance with that promise. And in both cases enforcement of the promise was necessary to avoid an injustice.

The majority indicates that the critical difference between *Banas* and the instant case is that in *Banas* "the employer could not have reasonably believe[d] that his employee

would rely upon a promise." Majority at 12. There is no support for this statement. A company supervisor gave Banas permission to make a grave marker in accordance with company policy as stated in a handbook. All of the evidence supports the proposition that the company should have reasonably believed that the employee would rely on the promise.

I have always believed that *Banas* was wrongly decided. *See Banas,* 348 Pa.Super. at 498–504, 502 A.2d 655–58 (Beck, J., dissenting). This conclusion is supported by the analysis which underlies the majority's decision in the instant case. Wholly apart from any contractual significance that might be attributed to the employee handbook distributed by the employer, the fact remains that Banas' employer made a promise which it reasonably could have expected would induce action on the part of Banas. I believe that the doctrine of promissory estoppel afforded Banas a remedy for the wrong done by his employer. The analysis of promissory estoppel in the majority opinion is correct, but it leads to the conclusion that Banas should have prevailed as well as Dr. Paul. *See* Majority at 12–15 (applying *Cardamone* test).

Although the majority goes to great lengths to distinguish the *Banas* case, I can only conclude that *Banas* has been substantially undermined. In my view, it would have been preferable for the majority to overrule *Banas* outright. In this way, we could have provided the bench and bar of Pennsylvania with a clear statement of the effect of the doctrine of promissory estoppel on employment-at-will.

In summary, for the above-stated reasons, I would affirm the award of damages as remitted on the basis of promissory estoppel, and I would affirm the trial court's entry of non-suit as to Dr. Paul's remaining claims, including defamation.

DEL SOLE, J., joins.