## Allstate Insurance Co. v. Warner

*Richard L. Kearns,* for plaintiff.
*Gary D. Martz,* for defendant Jeffrey A. Warner.
*Karl Hildabrand,* for defendant National Grange Mutual Insurance Co.

SPICER, *P.J.,* October 25, 1988—

## FINDINGS OF FACT

For purposes of simplicity, we will refer to individuals by full names the first time. Thereafter, for individuals sharing the same last name, identification will be by first name. Otherwise, it will be by last name.

The two insurance carriers will be referred to as "Allstate" and "National Grange" respectively.

The automobile referred to as a 1967 Chevrolet, or simply as a Chevrolet, is the vehicle bearing vehicle identification number 156697T171075. The Allstate insurance policy is policy number 0-08-884480.

(1) In the early part of 1982, Joan V.A. Miller was the mother of seven children, Joseph, John, Matthew, Mark, Michael, Luke, and Laura.

(2) At that time, at least Mark and Joseph resided with Joan.

(3) Mark owned a fairly new Dodge automobile, upon which he depended for transportation.

(4) The Dodge car was damaged and made inoperable for about eight weeks when it slid on ice and struck a pole.

(5) Mark purchased the Chevrolet for $250 for temporary transportation. Joan assisted, to a slight degree, in the purchase but all costs and purchase price were paid by Mark.

(6) After the purchase, the Chevrolet was used primarily by Mark but Joan used it occasionally.

(7) Although a certificate of title was not obtained until later, the Chevrolet was titled in Joan's name for insurance purposes.

(8) Joan made arrangements with Olin Beers to have the Chevrolet included in her Allstate policy.

(9) It was not unusual for Allstate to insure cars owned by children but titled in parents' names.

(10) After owning the Chevrolet approximately eight weeks, Mark obtained his Dodge from the repair shop and had no further need for the Chevrolet.

(11) Mark owed Joseph $75 and the two agreed that Mark would transfer the Chevrolet to Joseph in payment for the debt and an additional $75.

(12) Joan told her sons that Joseph would be required to obtain insurance coverage "because I am cancelling the Allstate coverage on it . . . ."

(13) Thereafter, Joseph obtained coverage through National Grange and assumed control over the Chevrolet.

(14) The certificate of title was not transferred to Joseph and title remained in Joan's name.

(15) Joan went to Beers and directed him to remove the Chevrolet from her Allstate policy.

(16) Beers attempted to recompute the premium but knew that Allstate's central office would compute final figures.

(17) The content of communications between Beers and Allstate's central office is unknown. It is also unknown whether Beers actually communicated with the office.

(18) Allstate removed several drivers from coverage and recomputed the premium at $455.

(19) Allstate maintained the policy in effect for the Chevrolet.

(20) Joan paid the premium charged by Allstate although she complained to Beers and said she would not pay a premium for the Chevrolet.

(21) The renewal notice sent by Allstate to Joan, prior to April 11, 1982, clearly indicated that the Chevrolet was covered.

(22) The Allstate policy was in effect and included the Chevrolet in coverage during the period beginning April 11, 1982, and ending October 11, 1982.

(23) Although Joan attempted to have the Chevrolet removed from the policy, she paid a premium knowing it was listed on the policy.

(24) Allstate has not refunded to Joan the premium paid for covering the Chevrolet.

(25) On April 25, 1982, Joseph was driving the Chevrolet and Jeffrey A. Warner was a passenger.

(26) On the above date, Joseph was involved in a single-car accident and Warner sustained serious and permanent injuries.

(27) On April 25, 1982, Warner resided by himself at R.D. no. 2, East Berlin, Pa. 17316, did not own a motor vehicle, was not a named insured on any motor vehicle insurance policy, and did not reside with any relative who owned a motor vehicle, such that Warner was not covered under any motor vehicle insurance policy issued pursuant to the Pennsylvania No-fault Motor Vehicle Insurance Act as of April 25, 1982.

(28) On the date of the accident, Joseph resided with Joan.

(29) After the accident, Joan procured a certificate of title and conveyed title to the Chevrolet to a junk or salvage business.

(30) Joan's actions were required to dispose of the Chevrolet, which was demolished in the accident, and did not personally benefit her.

(31) There has been no reliance by any of the parties on Allstate's coverage of the Chevrolet.

(32) Warner sued Joseph as a result of the accident, in proceedings docketed in this court 83-S-551.

(33) National Grange has admitted coverage but seeks pro rata contribution from Allstate for basic loss benefits under 40 Pa. C.S. §1009.204.

(34) Damages involved in the lawsuit will exceed coverage limits of the National Grange policy.

## CONCLUSIONS OF LAW

(1) Allstate is not estopped from denying an insurance contract.

(2) The Allstate policy was in full force and effect at the time of the accident.

(3) Allstate, not having rescinded the policy coverage and refunded the premium paid, cannot avoid the policy on the grounds of mutual mistake.

(4) Allstate is bound by its policy to provide coverage for the Warner suit, 83-S-551.

## DISCUSSIONS

The court has attempted to simplify and state factual findings and has not adopted the wording proposed by counsel. This should not be construed as disapproval of counsel's efforts. All counsel have performed admirably, for which we are grateful.

This is a case of first impression. There are no cases which provide more than very rough guidance. We have departed, slightly, from one suggested analysis submitted by counsel because we do not view issues quite the same as counsel. Again, this is not a criticism. Counsels' research has been very helpful as have been their arguments.

Both Warner and National Grange argue that Allstate should be estopped from denying coverage. This might be the case were the parties different. Allstate would certainly be estopped from similar attempts were, for example, Joan seeking coverage. As it is, the record is very clear that neither Joan or Joseph relied upon Allstate's representation of coverage. Joan, in fact, has expressed sentiments indicating she would prefer that Warner not benefit. Joseph obtained his own insurance. Warner did not inquire about insurance coverage before becoming a passenger.

An en banc decision by Superior Court recently discussed promissory and equitable estoppel. Equitable estoppel, which is used to preclude a person from asserting or denying a claim, requires reasonable reliance on Allstate's misrepresentation that insurance coverage was in place for the Chevrolet. Promissory estoppel, which can be used as a cause of action, requires actual inducement of action of forbearance. *Paul v. Lankenau Hospital,* 375 Pa. Super. 1, 543 A.2d 1148 (1988). Neither applies to this case.

We conclude, on the other hand, that Allstate cannot avoid the contract on a theory there was a mutual mistake. Certainly, Joan intended to delete the Chevrolet. Beers may have intended to accomplish this for her. Joan described Beers as always writing little notes and wondered what he did with them. Evidently, he didn't send the right note, if he sent anything at all, because coverage continued and the premium was paid and retained.

There was little more than a slight effort to rescind the policy. Allstate did nothing. Joan paid the premium and Allstate kept it. Thus, reduced to simplist form, the policy was in force and covered the Chevrolet.

We agreed with National Grange that Allstate cannot avoid the contract by pleading its own mistake. *Tudesco et ux. v. Wilson,* 163 Pa. Super. 352, 60 A.2d 388 (1948), and that once liability attaches under an insurance contract it is too late to talk about reforming it. See *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983). Policy reasons, if none other, dictate this position.

In this respect, Allstate has been placed in the unenviable position of arguing with its own computer. Its brief, page nine, states, in part "[t]he information from the computer that a full premium of $455

was paid defies common sense." Some may consider it poetic justice that a large company which rules by computer is also cut by it. Nonetheless, Allstate's attempts to describe premium arrangements otherwise than including the Chevrolet are futile.

A great deal has been said about title. Each side has argued that title resided in one party or the other.

There are many cases which hold (1) title governs issues of coverage, and (2) certificates of title don't necessarily determine title.

In *Majors v. Majors,* 349 Pa. 334, 37 A.2d 528 (1944), the Supreme Court characterized a certificate as only being some evidence of title. Judge Sheely, late and great president judge of this court, said that certificates were not "a warrant of ownership or muniment of title." *Kump v. State Automobile Insurance Association,* 35 D. & C. 2d 238 (1964).

National Grange and Warner quickly point to control exercised by Joan in support of their arguments that Joan was the owner. Allstate points to virtual agreement by the Miller family that first Mark and then Joseph owned the automobile.

Allstate cites the case of *Palladino v. Dunn,* 361 Pa. Super. 99, 521 A.2d 946 (1987). In that case, a lady completed all arrangements for the purchase of an automobile except to sign. She paid the purchase price and had the car insured. Before signing, however, she wanted to take a test drive. Struck by another car while pulling from the parking lot, she was killed.

Applying Uniform Commercial Code principles, (13 Pa. C.S. §2606), the court held she had not accepted the goods and that title had not passed. Thus, the car dealer's insurance carrier was required to provide primary coverage. Excess cover-

age, however, was placed on her policy under "other auto" provisions. We assume, but cannot be sure, that this was based upon general language which covered automobiles driven with the consent of owners.

In normal circumstances, such authority might be persuasive. However, this is where we depart slightly from counsel's analyses.

It is clear the arrangement followed by the Miller family was commonly recognized by Allstate. For example, Regina Nally, an Allstate employee, said, in her deposition:

"That could be a lot of different reasons. I mean sometimes when parents have cars on their policy, they belong to their kids or, you know, their kids are using it part of the time, they make their kids pay part of the insurance premium. And rather than have their kids give them the money and them write us one check, their kids will just send their payments in separate, you know, take it into the agent, whatever. That happens a lot."

It is a common practice, followed in many families, for parents to hold legal and children equitable title. Rights of parents are not confined to passive holding of legal title. Parents many times exercise the same control as did Joan. She told her sons that no transfer would be approved until Joseph obtained insurance. She disposed of the car after the accident.

Legal title held by Joan was recognized by Allstate as sufficient basis for her obtaining insurance when Mark owned the car.

In reality, nothing changed when Mark sold to Joseph except additonal insurance was procured. That certainly benefitted Allstate. It did not prejudice it. Mark was a resident son, Joseph was a resident son. The policy continued.

## DECREE NISI

And now, October 25, 1988, the court rules that Allstate's policy was in force at the time of the accident with respect to the Chevrolet and that Allstate is bound by the terms of its policy.

This decree is entered nisi this date and will be confirmed absolute if no exceptions are filed within 10 days.