**In re Tobin FRYMIRE, Debtor.**

**Tobin FRYMIRE, Plaintiff,**

**v.**

**PAINEWEBBER, INC., Lee Lovejoy, Edward Sparkman, Trustee, Defendants.**

**Bankruptcy No. 87–03721S.**
**Adv. No. 88–0341S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 10, 1989.

526

Jerome H. Ellis, Glenside, Pa., for debtor-plaintiff in this action.

Edward Sparkman, Philadelphia, Pa., for defendant-trustee.

Gale White, Francis P. Devine, III, Philadelphia, Pa., for defendants.

Mitchell W. Miller, Philadelphia, Pa., for debtor-plaintiff in bankruptcy generally.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

TOBIN FRYMIRE, the Debtor in this Chapter 13 case and the Plaintiff in this adversarial proceeding (hereinafter referred to as "the Plaintiff"), asserts what is, under the controlling Pennsylvania law, a most difficult cause of action on which to prevail, *i.e.*, a case contending that his discharge from employment was actionably wrongful. We find that the Plaintiff has established two "wrongs" in his employment relationship to which he was subjected: (1) a reneging on a promise to compensate him $20,000.00 annually for conducting a training program for young stockbrokers on behalf of his employer-brokerage firm; and (2) the firm's firing him and thereby preventing him from fulfilling an undertaking to repay an alleged $30,000

balance of an advance compensation award (hereinafter "ACA") which would have been eliminated without payment had he remained with the firm for four years. However, we find that the Debtor has clearly not met the high level of proof necessary to justify more extensive relief for his wrongful discharge under any exceptions to the "termination at will doctrine," or theories proferred based upon "deceit and fraud" or "promissory estoppel." Also, we conclude rather easily that he has also failed to establish that evaluate statements by his employer concerning his stint of employment were false or malicious, which would have been necessary to sustain his defamation claim. Therefore, we conclude that the Debtor is entitled only to relief directly related to the two "wrongs" he has established—an award of compensatory damages of $4,533.33 and elimination of his liability to repay the ACA.

### B. PROCEDURAL HISTORY

The Plaintiff's main bankruptcy case, filed on July 24, 1987, by experienced bankruptcy counsel, has been rather uneventful. The Plaintiff's former employer and the first-named Defendant herein, PAINEWEBBER, INC. (hereinafter referred to as "PW") filed, on two occasions, motions for relief from the automatic stay to pursue its claims against the Debtor before the National Association of Security Dealers (hereinafter "NASD"), wherein the Debtor had raised the claims set forth herein as counterclaims. The first of these motions was dismissed and the second was withdrawn. The Debtor's plan was confirmed on April 7, 1988.

PW filed a proof of claim in the Debtor's main bankruptcy case (no. 8) in the amount of $30,000.00 plus interest on December 10, 1987. This adversary proceeding was therefore commenced by the Debtor's separate special counsel[1] in the form of a counterclaim by the estate against a party filing a proof of claim against the estate, *i.e.*, PW, on February 17, 1988. It therefore

---

1. We note that the Debtor's special counsel has not yet filed a fee petition in the Chapter 13 case, which is necessary if he expects to be paid in excess of $500. See Local Rule 2002.2.

may be classified as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(C). Furthermore, counsel for all of the active parties expressly consented, in a colloquy before us on February 2, 1989, that we may determine it. *See* 28 U.S.C. § 157(c)(2).[2] Therefore, we shall proceed to both hear and finally determine all issues raised in this proceeding.

Prior to trial, PW moved, at different times, to dismiss both the original Complaint and an Amended Complaint. The Amended Complaint was filed by permission of this court granted in ruling on the motion to dismiss the original Complaint, and added LEE H. LOVEJOY (hereinafter "Lovejoy"), the Plaintiff's supervisor at PW, as a defendant and the Standing Chapter 13 Trustee, EDWARD SPARKMAN, as a nominal defendant. The motion to dismiss the Amended Complaint elicited an Opinion of June 24, 1988, reported at 87 B.R. 856 (Bankr.E.D.Pa.1988). Therein, we recited the procedural history of the matter to that date, *id.* at 857–58, and proceeded to dismiss a Count based on a claim of intentional infliction of emotional distress. *Id.* at 860–62. We also discussed, in some detail, the parameters of a Count asserting a defamation claim arising from the contents of an evaluative form sent by Lovejoy to a subsequent employer of the Plaintiff. We observed that, in these circumstances, the Defendants enjoyed a qualified privilege which allowed the Plaintiff to succeed in such a claim only if the Plaintiff established that the published matter in issue was both false and malicious. *Id.* at 858–60.

We need not repeat the procedural history outlined in that Opinion and we have neither the space nor the inclination to re-

cite the distasteful series of discovery disputes which arose between counsel thereafter. On August 15, 1988, about six weeks prior to the established trial date of September 27, 1988, PW and Lovejoy (referred to collectively hereinafter as "the Defendants") filed a motion for summary judgment. The Brief in Reply thereto was not filed until September 15, 1988. In a Memorandum filed on September 27, 1988, the date of the commencement of trial, we granted Lovejoy's request to dismiss the defamation action as to him on the ground of the applicable one-year statute of limitations, 42 Pa.C.S. § 5523(1). However, we again declined an invitation to dismiss the defamation claim in its entirety based on PW's assertion that, in discovery, it was revealed that the Plaintiff had signed a form consenting to release of the allegedly defamatory evaluative form. We nevertheless declined to hold that such "consent" to publication rendered communications to outside third parties absolutely privileged.

The trial commenced on September 27, 1988, and proceeded about six hours daily on that date and on September 29, September 30, October 4, 1988, and October 5, 1988. At its close, the Plaintiff first indicated that he wished to procure a Transcript, then unsuccessfully moved for us to supply same *in forma pauperis*, then decided to purchase the Transcript after all. The Transcript was completed on December 8, 1988, and, rebuffing a misplaced effort of the Plaintiff's counsel to delay its filing, we issued an Order of December 9, 1988, requiring the parties to file their respective proposed Findings of Fact, Conclusions of Law, and Briefs on or before Janu-

---

**2.** Counsel for the Plaintiff called our Courtroom Deputy on February 6, 1989, and attempted to withdraw this consent, presumably because, *after* the consent was given, we indicated our intention not to sustain many of the Plaintiff's claims. These misplaced tactics of counsel are rendered moot by our decision that this is a core proceeding, which we may determine in any event. We note that counsel nevertheless filed what we believe is a totally misplaced motion to withdraw the reference of this proceeding to us in the district court, pursuant to 28 U.S.C. § 157(b)(5). We believe that this mo-

tion is misplaced for two reasons: (1) It is *most* untimely, coming only *after* trial, briefing, and a preliminary indication of our decision; and (2) Except for arguably the "tag along" defamation claim, the Plaintiff's case is not a tort action, but sounds principally in contact. *Compare In re Direct Satellite Communications, Inc., Dechert Price & Rhoads v. Direct Satellite Communications, Inc.,* 96 B.R. 507, 515 (Bankr.E.D.Pa. 1989) (court determines malpractice actin as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D)).

ary 9, 1989 (Plaintiff), and January 30, 1989 (Defendants).

On January 5, 1989, the Plaintiff moved to reopen the record to append, to a Deposition of same already of record in lieu of testimony, further testimony from one Ann Haviland, who had recently left her prior employment by PW as a sales assistant (secretary). Ms. Haviland had worked in PW's Philadelphia office during the Plaintiff's tenure there, and also worked in its Somers Point, New Jersey, office when the Plaintiff was considering an offer to work there. The proffered testimony rebutted trial testimony from Charles Donovan, the supervisor of the Somers Point office, that the Plaintiff had never met him at that office for an appointment. Although we believed that the materiality of this addition to the record was minimal, we allowed the Affidavit of Ms. Haviland's proposed testimony to be added to the record, as a supplement to her Deposition, in an Order of February 2, 1989, thus closing the record on that date.

Pursuant to Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), we present our decision in the form of Findings of Fact and Conclusions of Law recited as headnotes in Discussions that follow.

## C. FINDINGS OF FACT

1. The Plaintiff, 44 years of age at the time of trial, is presently married to his second wife, Linda Frymire (hereinafter "Linda"). He has three children, aged 15, 12, and 10, by his first marriage to the former Carol Frymire (hereinafter "Carol"). The children reside with Carol. The Plaintiff had, for several years, paid child support on their behalf, but, at the time of trial, he was about a year in arrears on these payments.

2. A college athlete and a veteran of some distinction, the Plaintiff played two years as a catcher in the Philadelphia Phillies professional baseball organization, left baseball due to an arm injury, and from 1972 to 1980 worked in his own real estate and construction businesses, which ultimately failed.

3. In 1980 and 1981, the Plaintiff trained and thereafter was employed as a stockbroker with Shearson, Lehman Brothers and thereafter moved to Merrill, Lynch, Pierce, Fenner, and Smith (hereinafter "Merrill"). During part of his (first) tenure at Merrill, he spent a considerable part of his time counseling young brokers and became a "team leader" of young brokers, for which he was compensated by additional "production credits," i.e., by adding amounts to the base on which his compensation was computed.

4. Shortly before leaving Merrill, the Plaintiff assisted that company in forming a Media, Pennsylvania, office, for which accomplishments he was accorded a $30,-000.00 "production credit."

5. In summer, 1984, The Plaintiff visited a close friend from his college days, Michael McBath (hereinafter "McBath"), in Florida. McBath, who played five years a lineman with the Buffalo Bills professional football team, was and is a most successful PW broker, doing business of about $750,-000.00 annually.

6. McBath suggested that the Plaintiff consider leaving Merrill and joining PW. There is a dispute as to whether the Plaintiff told McBath, or any managerial employee of PW who contacted him thereafter, that he would consider joining PW only if he were ultimately able to get into management himself. We find that the issue of whether the Plaintiff would be able to get into management was mentioned to McBath and the PW managerial employees as a hope on the Plaintiff's part, but not as an absolute condition for joining PW, and that neither McBath nor the PW managerial employees with whom he spoke understood this as a condition of his employment at PW, nor was it an issue upon which they did or could make a commitment to the Plaintiff.

7. McBath thereafter suggested to Sheldon Chaiken (hereinafter "Chaiken"), a PW officer in Philadelphia, that Chaiken consider hiring the Plaintiff in PW's Philadelphia office. Thereafter, Chaiken and Lovejoy, the latter of whom had recently joined PW as the manager of its Philadel-

phia office, contacted the Plaintiff to discuss his coming with PW.

8. In July and August, 1984, the Plaintiff negotiated with Lovejoy over terms for his joining PW during lunch engagements. A very significant issue was whether the Plaintiff would receive an ACA upon his joining PW, and the amount of same. An ACA is a lump-sum "loan" which a broker can eliminate without payment or salary offset by remaining with a brokerage firm for a given number of years, usually three years. It is paid in recognition of the fact that a broker changing firms will suffer income loss due to displacement, and that a broker benefits his new firm by bringing to it his "book" or list of customers.

9. The Plaintiff originally requested, from Lovejoy, an ACA of $50,000.00 as a condition of leaving Merrill and coming to PW. Lovejoy explained that PW's policy was to allow an ACA only if a broker's production at his present firm exceeded $200,000.00 over the past year. At Lovejoy's request, the Plaintiff produced his Merrill production records for part of the past year which, even with the $30,000.00 credit for the Media office, showed a production of only about $177,000.00 for the past 12 months. However, believing that the Plaintiff might be "another McBath," Lovejoy manipulated the Plaintiff's records to reflect an approximate annual production of approximately $197,000.00. With Chaiken's permission, he offered a $40,-000.00 ACA to the Plaintiff. At the Plaintiff's request, for tax purposes, it was agreed that the $40,000.00 ACA would be forgiven at $10,000.00 annually for four years, instead of over the normal three-year period.

10. Another, less significant, term discussed was the Plaintiff's resumption, at PW, of the training activities which he had at one time performed at Merrill, which the parties mutually agreed that he would undertake. The Plaintiff contends that this was discussed as a stepping stone to management and that there was some discussion of the Plaintiff's replacement of Lovejoy's first assistant, William Dougherty (hereinafter "Dougherty"), who was present at one negotiating lunch, if Dougherty left that position. However, we find that, while the Plaintiff's desire to get into management was discussed among the parties, they all knew or should have known that Lovejoy had no authority to make any promises on this issue.

11. Desiring a written commitment from PW before he resigned at Merrill, the Plaintiff had Lovejoy type a Memorandum of September 12, 1984, on PW's stationery, the complete text of which was as follows:

TO: Tobin W. Frymire
FROM: Lee H. Lovejoy
SUBJECT: Terms of Employment

1. Advance Compensation Agreement: The sum of $40,000 in the form of a loan, interest free, principal forgiven over 4 years at yearly rate of 25-25-25-25%. Paine Webber will provide life insurance to cover the "loan" at no cost to you.

2. First month guaranteed draw of $5,000; plus commissions at grid rate.

3. Second month guaranteed draw of $2,500; plus commissions at grid rate.

4. Additional duties as Training Manager.

5. Private Office will be made available with assistance from shared secretary (max 2 other people).

6. A nominal expense allowance of $150/month.

/s/ Lee H. Lovejoy

12. Immediately after receiving the Memorandum, the Plaintiff resigned from Merrill, went through routine personnel procedures at PW, and asked for immediate payment of his $40,000 ACA. The Plaintiff was very disappointed to learn, from Lovejoy, that it was not yet processed, since he had relied on getting this sum immediately. Ultimately, Lovejoy approved an immediate initial payment of $5,000.00, and the remainder was paid to the Plaintiff on October 11, 1984.

13. While PW had made no commitment to make this payment immediately, there was some evidence that immediate payment of an ACA is normal in the industry. In any event, this incident resulted in cer-

tain hard feelings of the Plaintiff towards Lovejoy, which escalated over time.

14. Per his agreement with Lovejoy, the Plaintiff began performing training-manager duties, including preparation of a training manual, and interviewing new applicants for employment with PW as brokers. It was understood that the Plaintiff would begin his training-manager duties in 1984 without compensation, but would be compensated for same beginning on January 1, 1985.

15. Lovejoy and the Plaintiff discussed the compensation to be paid to the Plaintiff for his training-manager duties in December, 1984. Lovejoy agreed and shook hands with the Plaintiff on his agreement to pay an extra $20,000.00 annually to the Plaintiff for this work. Lovejoy claimed that he believed that this was the sum that the Plaintiff had received for these duties while he worked as a trainer at Merrill, even though in fact the Plaintiff only received a production credit in that amount. Ann Haviland, a PW sales representative, testified, via deposition, that she had seen a document written by Lovejoy confirming that he *had* agreed to pay the Plaintiff $20,000.00 for these services. At trial, Lovejoy denied that he had agreed to this figure.

16. Nevertheless, in mid April, 1985, the Plaintiff, after numerous requests for what he believed would be compensation at $20,-000 annually, received a check for compensation for these duties to date in the amount of only $1,300.00. Lovejoy advised the Plaintiff that compensation at this rate was all that he would receive, pursuant to a production credit formula for compensation which Chaiken and Lovejoy, unbeknown to the Plaintiff, had determined to pay him. Angered by this action, the Plaintiff abruptly and permanently terminated his training-manager duties.

17. The Plaintiff became personally alienated from Lovejoy as a result of the breach of the agreement regarding his compensation for training-manager duties, combined with his earlier belief that Lovejoy had breached an agreement regarding the timing of his ACA payment. The Plain-

tiff also became angry when Lovejoy, for at least a brief period, had him share a secretary with three other brokers. He also accused Lovejoy of removing certain furniture from his office, a charge which was not substantiated. While Lovejoy, a rather low-key individual, did not share the degree of intense animosity towards the Plaintiff that the Plaintiff had towards him, this animosity continued to grow in the Plaintiff. However, he chose not to discuss it with Chaiken or any other PW officer, nor attempt to "clear the air" with Lovejoy.

18. Due in part to his personality conflicts with Lovejoy, the Plaintiff performed poorly as a stockbroker at PW, and, in 1985, had total production of $95,647, which was about half of what either he or PW expected.

19. In December, 1985, Linda urged her husband to put his feelings towards Lovejoy behind him and concentrate on selling and rebuilding his client base. In January, 1986, because of his attempt to follow his wife's advice and due to large sales to Rabbi Abraham Fuchs and his father-in-law, the Plaintiff experienced a month of high (over $30,000) production. Although PW, at trial, claimed that the "quality" of this production was poor, because Rabbi Fuchs ultimately lost money on it, Rabbi Fuchs himself testified that the investment met his needs and he was totally satisfied with the Plaintiff's services to him. Therefore, we find that this and all complaints by PW concerning the "quality" of the Plaintiff's production were baseless.

20. In February and March, 1986, Plaintiff's production dropped to about $17,000 per month, and, thereafter, it consistently dropped (April—$8,616; May—$4,487; and June—$1,041). The Plaintiff's discouragement arising from Lovejoy's criticism of his production contributed heavily to this downward spiral of his production.

21. In June, 1986, Lovejoy contacted Chaiken and advised Chaiken, for the first time, that the Plaintiff's attitude and production was not good, and insisted that he be terminated, or at least removed from the Philadelphia office. Lovejoy asked the

Plaintiff to resign from his job, which he refused to do, whereupon Lovejoy terminated the Plaintiff's job, effective at the end of July, 1986.

22. After becoming aware of Lovejoy's desire to terminate the Plaintiff's services but before he actually left in July, 1986, Chaiken attempted to locate another position for the Plaintiff with PW outside of the Philadelphia office. This activity was motivated, at least in part, by Chaiken's desire to recoup the ACA deficit which would be recorded on PW's books upon the Plaintiff's departure. The Plaintiff unsuccessfully interviewed with Melissa Surow, PW's Eastern Training Director, for a training position. He also interviewed for a sales position at PW's office in Somers Point, New Jersey, near Atlantic City. However, he concluded that the Somers Point office was too far to which to travel from the Philadelphia area on a daily basis and he did not wish to relocate due to the proximate presence of his children in the Philadelphia area.

23. After the Plaintiff had left his position, in August, 1986, Chaiken also spoke to the Plaintiff about the possibility of a position on his own staff. Apparently due to a misunderstanding as to whether a certain individual was available to interview him, the Plaintiff put off the interview to take a trip to visit family in the Chicago area. When he returned, Chaiken, who interpreted the Plaintiff's departure on this trip as lack of interest, informed him that the position had been filled. Chaiken made no further efforts to assist the Plaintiff in finding employment, allegedly because he believed that the Plaintiff had expressed insufficient interest in the position on his staff.

24. Thereafter, in fall of 1986, Michael Boland (hereinafter "Boland"), the Plaintiff's former supervisor at Merrill, agreed to rehire the Plaintiff at Merrill. Although Boland claims that he had reservations about rehiring the Plaintiff and that he did so mostly because he "felt sorry for his wife." However, we assume that his previous work-record at Merrill had been satisfactory and that Boland anticipated that this development would be beneficial to Merrill.

25. Upon the Plaintiff's return to Merrill, his production was "minimal"—averaging only about $4,000 or $5,000 per month —and his attitude was admittedly poor.

26. Shortly after the Plaintiff was rehired by Merrill, he executed a release which authorized PW to fill out and dispatch an "Employment Verification Reference" form to Merrill. Lovejoy completed the form for PW, and stated that the Plaintiff was discharged by PW and would not be re-employed by PW because of his "Poor attitude + Less than satisfactory production."

27. Boland stated that he was not surprised by PW's comments on the form and would have similarly evaluated the Plaintiff on the basis of his second stint with Merrill. We also believe that this evaluation was not unfair, given what we believe was the Plaintiff' destructively stubborn reaction to what he believed was Lovejoy's overall dishonesty to him. The evaluation was, therefore, not inaccurate or misleading, and was therefore not intentionally completed inaccurately by Lovejoy.

28. Merrill terminated the Plaintiff in spring, 1987, apparently by mutual agreement. Boland credibly stated that the comments made by Lovejoy on the employment reference verification form had no bearing on Merrill's decision to terminate the Plaintiff.

29. The parties called two equally well-qualified psychiatrists who had examined the Plaintiff prior to trial, Dr. Robert Sadoff, on behalf of the Plaintiff, and Dr. Harold J. Byron, on behalf of the Defendants. Both agreed that the Plaintiff was adversely affected emotionally by what he believed was his unfair treatment by the Defendants. Dr. Sadoff, unlike Dr. Byron, characterized the Plaintiff as suffering from a mental illness, i.e., "anxiety disorder," as he had difficulty sleeping and turned to drinking for a period of time. However, neither psychiatrist believed that the Plaintiff was in need of psychiatric treatment nor medication at any time.

30. The Plaintiff also called an economic actuarial expert, David Bunin. Upon the assumption that the Plaintiff's earnings were $90,000 in 1984 and would have increased as expected for a normal stockbroker over the rest of his working life, Mr. Bunin estimated the Plaintiff's loss of gross earning capacity, as a result of his discharge by PW, between $2,028,515 and $1,652,708, and his loss of net earning capacity between $1,278,002 and $1,041,206.

31. Since May, 1988, the Plaintiff has been working in real estate sales, and, at the time of trial, was earning approximately $26,000 annually. He had no inclination or desire to attempt to return to work as a stockbroker, believing, apparently accurately, that his discharges from both PW and Merrill would effectively bar his rehire in that industry.

D. CONCLUSIONS OF LAW/DISCUSSION

1. *THE PLAINTIFF HAS FAILED TO ESTABLISH A CLAIM FOR WRONGFUL DISCHARGE UNDER THE CONTROLLING PENNSYLVANIA LAW*

a. PENNSYLVANIA ADHERES TO THE TRADITIONAL VIEW THAT EMPLOYMENT IS GENERALLY "AT WILL" AND AN EMPLOYEE HAS NO CAUSE OF ACTION FOR AN ALLEGED WRONGFUL DISCHARGE

█ As we noted in our Opinion of June 24, 1988, 87 B.R. at 858, and emphasized in our later unpublished Memorandum of September 27, 1988, the Plaintiff's Amended Complaint designates three Counts— "Fraud," Defamation, and Intentional Infliction of Emotional Distress. The last of these has already been dismissed, 87 B.R. at 860–62, and the second was characterized as "unlikely" to succeed, *id.* at 860, in the aforesaid Opinion. We shall discuss our ultimate conclusion that this claim, in defamation, lacks merit in a separate, brief discussion later. *See* pages 538–39 *infra.*

The remaining claim, though labelled as "Fraud," is apparently meant, as we noted in the Memorandum, to include all of the Plaintiff's claims relating to the wrongs which he suffered strictly from his employment relationship at PW. It is therefore clear that all of these "fraud" claims are contentions that the Plaintiff was wronged in his capacity as an employee. In our view, all of these claims must be decided under the law of Pennsylvania controlling employer-employee relationships. Further, we note that the damages which the Plaintiff urges us to award to him are based on the fact that he would have attained certain earnings if he had remained employed as a stockbroker at PW, as the parties all contemplated on September 12, 1984. Therefore, we easily conclude that, at bottom, all aspects of the Plaintiff's "fraud" count assert claims of damages for his wrongful discharge at the hands of the Defendants.

In his post-trial Brief, the Plaintiff subdivides what had been designated as "fraud" claims in his Amended Complaint into the headings of "Deceit and Fraud," "Wrongful Discharge," and "Promissory Estoppel." It appears to us that the Plaintiff is attempting thereby to de-emphasize the overlying "wrongful discharge" flavor of all of his claims, and that this emphasis is tactical. He perceives that the law of Pennsylvania is unreceptive to wrongful discharge claims *per se*, and he therefore hopes to avoid, if possible, the placement of his claims in this category. Unfortunately, this effort cannot succeed.

It is true, as the Plaintiff argues, that exceptions have developed to the harsh impact of the Pennsylvania law on wrongful discharge, which is, essentially, that an employee is generally considered to be hired at will, and therefore is subject to termination of the employment relationship, without redress, "for any or no reason." *Geary v. United States Steel Corp.*, 456 Pa. 171, 175, 319 A.2d 174, 176 (1974). However, it must be recalled that the exceptions to the *Geary* rule are just that and that the *Geary* rule applies to all wrongful-discharge-related claims unless an employee is able to succeed in establishing the application of an exception.

Therefore, we believe that the Plaintiff's claims of "Deceit and Fraud" and "Promissory Estoppel" must be evaluated in their context as claims of exceptions to the *Geary* rule. We state this at the outset because, while the "Promissory Estoppel" argument seems to be presented in that light, it does not appear that the Plaintiff's "Deceit and Fraud" argument has been so presented.

 The parties agree that Pennsylvania law controls this case, and, therefore, as a federal court sitting in Pennsylvania, we must apply the law of this state as it has been interpreted by the Pennsylvania Supreme Court in deciding this case. *See, e.g., In re Asbestos Litigation*, 829 F.2d 1233, 1235 (3d Cir.1987), *cert. denied sub nom. Owens–Illinois, Inc. v. Danfield*, — U.S. —, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). Interpretations of the law of Pennsylvania by its intermediate appellate courts, such as the Superior Court, are entitled to considerable weight, but are only predictions of what the Pennsylvania Supreme Court would hold if faced with that particular case, which cannot substitute for the clear pronouncements of the Supreme Court. *See Sprague, Levinson & Thall v. Advest, Inc*, 623 F.Supp. 11, 14 (E.D.Pa.), *aff'd*, 780 F.2d 1016 (3d Cir.1985). These principles are emphasized because of the exclusive reliance of the Plaintiff on Pennsylvania Superior Court cases, with not even a citation to *Geary*, the case upon which we must place the most reliance.

The plaintiff-employee in *Geary* suffered a successful demurrer to his cause of action, despite allegations of a most compelling set of facts in his complaint. The plaintiff, a salesman employed continuously by the defendant for fourteen years, claimed that he was discharged solely because he legitimately protested the safety of a new product of his employer to his superiors and ultimately to a vice-president of his employer. Although the product was, as a result of his efforts, reevaluated and withdrawn, the hard feelings created thereby led, according to him, to his otherwise baseless dismissal. 456 Pa. at 173–74, 319 A.2d at 175.

The Pennsylvania Supreme Court, in *Geary*, as indicated above, strongly affirmed the "employment at will" doctrine in sustaining a demurrer to this lawsuit. The only exceptions recited to this doctrine were (1) "a statutory or contractual provision to the contrary, ..." 456 Pa. at 175, 319 A.2d at 176; (2) a breach of the employer's statutory duties; (3) acts which illegally affect competition; and (4) a class-type conspiracy against the employee. 456 Pa. at 176, 319 A.2d at 176.

All of the pertinent authorities recognize the vitality of the *Geary* rule. *See, e.g., Harrison v. James*, 558 F.Supp. 438, 444 (E.D.Pa.1983); *In re Hotstuf Foods, Inc.*, 95 B.R. 355, 357–358 (Bankr.E.D.Pa. 1989); *Paul v. Lankenau Hospital*, 375 Pa.Super. 1, 17–18, 543 A.2d 1148, 1156–57 (1988) (en banc); *Banas v. Matthews International Corp.*, 348 Pa.Super. 464, 479–86, 502 A.2d 637, 644–48 (1985) (en banc); and F. Cohen, *"At Will" Employment Rule Still Law in Pennsylvania*, 199 LEGAL INTELL. 2521 (Dec. 7, 1988). The Plaintiff can therefore prevail in his primary claim only if he succeeds in establishing that the instant case fits within an exception to the *Geary* rule and therefore should be analyzed differently.

b. THE PLAINTIFF HAS NOT SUFFICIENTLY ESTABLISHED THAT PW VIOLATED ANY CONDITION OF AN ENFORCEABLE EMPLOYMENT CONTRACT BETWEEN THE PARTIES IN DISCHARGING HIM

 The Plaintiff does not, and could not seriously contend, that his discharge by PW fell within any of the "public policy" exceptions, a narrow scope of which were recognized as an exception to the "employment at will" rule set down in *Geary*. His claim, if viable, must then fall within the "contractual provision to the contrary" exception set forth therein.

The Plaintiff presents this sort of an analysis directly in that portion of his Brief discussing claims which he labels as "Wrongful Discharge." He contends that the Memorandum of September 12, 1984, constitutes "portions" of a contract be-

tween the parties to which we can add the other terms bandied about in negotiations between the parties both at the time of employment and thereafter and conclude that the parties agreed to an employment contract for a definite term of at least four years.

However, although he does not so articulate it, the Plaintiff's "Deceit and Fraud" and "Promissory Estoppel" arguments are also based on the assumption that a contract arose which established the terms of the parties' employment relationship. The "Deceit and Fraud" asserted by the Plaintiff here arises from alleged misrepresentations made to him by Lovejoy in the context of an alleged employment contract. The "Promissory Estoppel" claim is based upon the Plaintiff's contention that PW is bound by promises and actions which estop PW from denying that it made a contractual commitment to the Plaintiff. Therefore, all of the Plaintiff's claims are based upon a conclusion that a contract exists, as articulated in the cases recognizing this factor as an exception to the *Geary* rule.

In *Hotstuf Foods, supra,* Judge Fox of this court, has very recently surveyed most of the state and federal cases interpreting Pennsylvania law which address the "contract exception" to the *Geary* rule. In that decision, he emphasizes that a necessary prerequisite of an employment contract is that it extend for "a definite period of duration," 95 B.R. at 358, and that "[t]he evidentiary standard for defeating the at will presumption is quite high." *Id.* at 358. *Accord, Cummings v. Kelling Nut Co.,* 368 Pa. 448, 451–52, 84 A.2d 323, 325–26 (1951); *DiBonaventura v. Consolidated Rail Corp.,* 372 Pa.Super. 420, 424–25, 539 A.2d 865, 867–68 (1988); *Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 208, 511 A.2d 830, 834–35 (1986); and *Darlington v. General Electric,* 350 Pa.Super. 183, 193–206, 504 A.2d 306, 311–17 (1986).

We do not believe that anything in the Memorandum of September 12, 1984, itself constitutes a commitment of PW to employ the Plaintiff for any definite period of time beyond two months. The reference therein to elimination of the Plaintiff's liability to repay the ACA over a period of four years is the only reference therein to any additional period of time and it is, at best, an indirect reference to any intention that the parties' employment relationship would last for at least four years. It might, in fact, be argued that any mention of the ACA's being a "loan" at all, as opposed to an outright unconditional payment, negates the assumption that the parties were entering into an employment contract for four years. If the Plaintiff were in fact being hired for a definite term of four years, the parties would have assumed that the four-year pay-out would have necessarily occurred during the term of employment and no loan would have been contemplated.

The parol evidence rule is a rule of substantive law which prevents adding terms to a written contract which arose from contemporaneous oral agreements of the parties to the contract. *See, e.g., Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 649 (3d Cir.1964) *Harrison, supra,* 558 F.Supp. at 442–44; *Keyser v. Margolis,* 422 Pa. 553, 559, 223 A.2d 13, 16–17 (1966); *Keleher v. LaSalle College,* 394 Pa. 545, 552, 147 A.2d 835, 839, *cert. denied,* 361 U.S. 12, 80 S.Ct. 66, 4 L.Ed.2d 50 (1959); and *Knirnschild v. Pittsburgh Brewing Co.,* 390 Pa. 606, 136 A.2d 316, 319 (1957).

The Plaintiff, recognizing the difficulties arising from absence of any definite term of employment beyond two months in the Memorandum, argues that the parol evidence rule is "inapplicable" because parties can contract orally, or subsequently modify a written contract orally, or merely put in writing a memorandum of an oral argument in which other terms are included by implication. The difficulty with all of these arguments is that, although the parties allegedly discussed other terms, we fail to find any meeting of the minds or final agreements on any of them, as in the case of the Plaintiff's claim of a commitment to elevate him into management, which we discredit. Furthermore, even the Plaintiff himself did not claim that any definite term of his employment, or the conditions under which he could be discharged, were ever discussed. We cannot allow terms neces-

sary for our recognition of the Memorandum as a valid employment contract to be created by implication.

■ There is a narrow category of cases in which parties who gave up valuable consideration and were then discharged shortly thereafter for *no* cause whatsoever have been held to impliedly have an employment contract for a "reasonable" duration of time, despite there being no agreement for employment for a definite term. *See O'Neill v. ARA Services, Inc.*, 457 F.Supp. 182, 184–86 (E.D.Pa.1978) (employee left managerial position for an offer to fill a security position for two years, after which he would receive a managerial position with his new employer; discharged because he discovered illegal operations by company officials while in security position); *Marsh v. Boyle*, 366 Pa.Super. 1, 530 A.2d 491 (1987) (newspaper employee left his previous city to work for paper in another city; discharged three months later without cause); *Smith v. Shallcross*, 165 Pa. Super. 472, 69 A.2d 156 (1949) (employee, due to his advanced years, agreed to accept new employment only on assurance of permanency and a guarantee of future income; discharged a year later for no apparent cause); and *Lucacher v. Kerson*, 158 Pa. Super. 437, 45 A.2d 245 (1946) (window-trimmer relocated from New York to obtain employment in Norristown; discharged after four days of employment without explanation).

Here, however, the Plaintiff did not undertake any substantial relocation in resigning from one Philadelphia brokerage firm to work in another. There is no allegation that the Plaintiff sacrificed any specific benefits at Merrill to come to work at PW.

■ Furthermore, assuming *arguendo* that the Memorandum of September 12, 1984, constituted an enforceable employment contract, we fail to see precisely how the Plaintiff contends that it was breached by PW. All of its terms, except possibly, for a limited period, the failure to provide the Debtor with a secretary shared with only two other brokers, were adhered to by PW. Clearly, the Plaintiff was not very concerned about any violation of this condition. There is no evidence that *this* condition was ever a particular source of a complaint or any hard feelings between the Plaintiff by Lovejoy.

We do find that Lovejoy broke a promise to the Plaintiff to compensate him in the amount of $20,000 annually for his training duties, and in fact, without warning, paid him considerably less. However, the amount of compensation which the Plaintiff was to receive for training duties was not contended, even by the Plaintiff, to be a term of his initial employment contract. This was a subsequent undertaking.

The discharge of the Plaintiff was, we believe, in fact ultimately due to his low production and his inability to resolve his personal differences with Lovejoy. Despite the Plaintiff's attempts to claim, at trial, that his production was not low, we find that it was, relative to all parties' expectations. The Plaintiff received his ACA on the assumption that he had and would produce at least $200,000 of business annually immediately upon joining PW. In fact, he produced less than $100,000 in his first year and, after a good start, had slacked off to a pace which would probably not have even yielded $150,000 in his second year.

While the Plaintiff's anger at Lovejoy was, to some degree, understandable, it is apparent to us that he carried this hard-feeling to an extensive degree which was not justified. The arrangement which he had made to be compensated for training duties with Lovejoy was an unusual one. He should have recognized that a snag could develop. Therefore, he should not have let this development of a snag destroy his career at PW. The Plaintiff avoided any further economic exploitation of him in this undertaking by summarily quitting his training duties, itself a possible act of insubordination which Lovejoy let pass. It simply was not rational for the Plaintiff to use this incident as justification for not only continuous animosity towards his superior, but as an excuse not to perform other aspects of his job as well. We refuse to conclude, as his counsel contends, that

the Plaintiff's stubborn nature excuses his irrationally self-destructive behavior. The Plaintiff, in making his claim for damages, wishes us to consider him as a mature, competent professional. We cannot, therefore, hold him guiltless for acting out his dissatisfaction in a manner so self-destructive that it would have embarrassed a young teenager.

Therefore, we believe that the discharge of the Plaintiff was not violative of an employment contract. Rather, it appears to have been justified under the circumstances. A *sine qua non* of a wrongful discharge case is that the employer lacks just cause for the discharge. Certainly, no justification was found for the plaintiff's discharge in *Geary*, decided on a demurrer to the plaintiff's self-serving complaint. In many of the other cases, employees were held barred from maintaining a cause of action, no matter how unjust the basis for their discharge, by the force of the *Geary* rule. Here, where the discharge may have been justified, we are particularly disinclined to buck the force of the *Geary* rule and decide the wrongful discharge issue in the Plaintiff's favor.

c. THE PLAINTIFF HAS NOT, IN ANY EVENT, ESTABLISHED THE ELEMENTS NECESSARY TO MAINTAIN A CAUSE OF ACTION IN "DECEIT AND FRAUD" OR "PROMISSORY ESTOPPEL"

As we stated in the foregoing discussion, any analysis of the Plaintiff's claims based on "deceit and fraud" or "promissory estoppel" must be considered in the shadow of the *Geary* rule, and the fact that any such claim would have to fall within the narrow, "contract" exception set forth in that case. However, even putting aside the difficulty of the employment-contract context in which the claims here arise, we do not believe that the demanding elements for either a cause of action in "deceit and fraud" or "promissory estoppel" are made out by the Plaintiff here.

■ It is well-established that there are five essential elements of any fraud action, as are set forth in *Scaife v. Rockwell-Standard Corp.*, 446 Pa. 280, 285, 285 A.2d

451, 454 (1974), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972):

> "(1) a misrepresentation, (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result." (quoting *Neuman v. Corn Exchange Nat. Bank and Trust Co.*, 356 Pa. 442, 450, 51 A.2d 759, 763 (1947)).

Moreover, as the *Scaife* case also holds, "every element" of the five recited above must be proven by "a very high standard," enunciated as "clear, precise, and convincing" or "indubitable." *Id.* Accord, e.g., *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 108, 109, 464 A.2d 1243, 1252, 1253 (1983). *Cf., e.g., In re Garcia*, 88 B.R. 695, 698–702 (Bankr.E.D. Pa.1988); and *In re Stelweck*, 86 B.R. 833, 846 (Bankr.E.D.Pa.1988) (proof of fraud, for purposes of challenges to a discharge or dischargeability of debts in bankruptcy requires that five comparable elements be proven by "clear and convincing" evidence). Although a fraud claim may be invoked in the employment context, *see Lokay v. Lehigh Valley Cooperative Farmers, Inc.*, 342 Pa.Super. 89, 492 A.2d 405 (1985), its role in such cases is obviously reserved for aggravated circumstances. *Lokay* involved a discharge of vice-president due to *admitted* fraud of employer's chief operating officer in reciting the employer's financial ability to sustain the plaintiff's promised salary; the only dispute was whether the officers's fraud was attributable to the employer. 342 Pa.Super. at 96–98, 492 A.2d at 408–09.

■ The threshold difficulty for the Plaintiff in asserting this cause of action is establishing even so much as a "misrepresentation" in the parties' alleged employment contract. All of the terms, except the later promise to compensate the Plaintiff $20,000 annually for performing training-manager duties, which we have already held could not conceivably be considered as part of the employment contract itself, were abided by. We also decline to con-

clude that the damages flowing to the Plaintiff were proximately caused by actions of the Defendants. *See Direct Satellite, supra,* 96 B.R. at 515 (the defendant's actions must be a substantial cause of damages to the plaintiff to constitute legally "proximate" cause therefor). Rather, we believe that the loss of the Plaintiff's employment was brought on, principally, by his own *overreaction* to the conduct of Lovejoy. Finally, there is no evidence of fraud on the part of Lovejoy, *i.e.,* an intention to deceive the Plaintiff. Even as to the reneged promise of Lovejoy to pay the Plaintiff $20,000 annually for his training-manager duties, we are not prepared to hold that Lovejoy violated this promise intentionally, but believe, to the contrary, that he simply erred in promising what he could not and did not deliver.[3] At least three elements of a cause of fraud have hence not been proven here by the Plaintiff by any standard, let alone by "clear and convincing" evidence. Therefore, this legal claim must fail.

█ Promissory estoppel has been invoked only by the lower Pennsylvania appellate courts in an employment context. *Paul, supra,* 375 Pa.Super. at 9, 543 A.2d at 1152–53; *DelConte v. Stefonick,* 268 Pa.Super. 572, 408 A.2d 1151, 1152–53 (1979); and *DeFrank v. County of Greene,* 50 Pa.Cmwlth. 30, 35–37, 412 A.2d 663, 666–67 (1980). All of these cases involved aggravated circumstances: dismissal of a doctor for giving away discarded hospital property, which he had earlier expressly been given permission to do (*Paul*); firing the prior owner of a restaurant, whose name continued to be used for the business, despite a promise by the buyer, as a condition of the sale, to hire the prior owner as manager (*DelConte*); and a municipality's dismissal of an employee in admitted derogation of procedures established in its own policy manual (*DeFrank*).

---

**3.** The Plaintiff also recites a doubtful theory that, where an employer is found to have displayed "malice" or a "bad motive" in discharging an employee, an exception to the "discharge at will" rule may be found. However, we note that this theory is also dependent on the finding of a contract between the employee and employer. *See Mudd v. Hoffman Homes for*

The elements of promissory estoppel are set forth in *Paul, supra,* 375 Pa.Super. 8, 543 A.2d at 1152, as follows:

(1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party seeking to assert the estoppel; and (3) no duty of inquiry on the party seeking to assert estoppel. *Stolarick v. Stolarick,* 241 Pa.Super. 498, 509, 363 A.2d 793, 799 (1976).

*Cf. In re Franks,* 95 B.R. 346, 353–354 (Bankr.E.D.Pa.1989) (sets forth elements of comparable theory of equitable estoppel). As we noted in our discussion of fraud, we question whether the utterance of any misleading words by Lovejoy resulted in the discharge of the Plaintiff. The only broken promise, *i.e.,* the agreement to pay $20,000 annually to the Plaintiff to serve as training manager, had no relation to the alleged original employment contract, and was not, in our view, the "proximate cause" of the Plaintiff's poor production and poor attitude. Rather, his own overreaction thereto was the "proximate" cause. The absence of this element and the absence of aggregating circumstances such as existed in *Paul, DelConte,* and *DeFrank* are, we believe, fatal to any claim of the Plaintiff based on this theory.

We therefore conclude that the Plaintiff has failed to state a claim for damages due to his discharge by PW on any of the theories articulated by him, or on any other cognizable theory.

### 2. THE PLAINTIFF HAS FAILED TO ESTABLISH THAT LOVEJOY'S WRITTEN EVALUATION OF HIM WAS ERRONEOUS, LET ALONE "MALICIOUSLY FALSE"

█ Our Opinion of June 24, 1988, contained a rather thorough discussion of the

---

*Youth, Inc.,* 374 Pa.Super. 522, 530–31, 543 A.2d 1092, 1096–97 (1988) (discharge motivated by an intention to prevent an employee's pension benefits from vesting is impermissible). Here, we doubt that an enforceable contract of employment exists and we find no malice present, as indicated in the accompanying text.

Plaintiff's defamation claim arising out of the statement by Lovejoy, on the Employment Verification Reference form supplied to Merrill, that the Plaintiff was discharged due to "Poor attitude + less than satisfactory production." We believe that other authorities, not referenced in our previous Opinion, 87 B.R. at 858–60, support our conclusion that this evaluation is not absolutely privileged, but is conditionally privileged, *i.e.*, actionable only if it were proven to have been both "false and malicious." *Id.* at 860. *See* 42 Pa.C.S. § 8343(a)(7); *McNulty v. Borden*, 474 F.Supp. 1111, 1120 (E.D.Pa.1979); *Hoover v. Peerless Publications Inc.*, 461 F.Supp. 1206, 1210–11 (E.D. Pa.1978); *Paul, supra*, 375 Pa.Super. at 19–20, 543 A.2d at 1157–58; *Geyer v. Steinbronn*, 351 Pa.Super. 536, 551, 506 A.2d 901, 909 (1986); and *Berg v. Consolidated Freightways, Inc.*, 280 Pa.Super. 495, 501, 421 A.2d 831, 834 (1980).

■ It is our conclusion that the aforesaid evaluation of the Plaintiff by Lovejoy was neither false nor malicious. The Plaintiff *did* have a poor attitude. His production *was* less than either he or PW believed that it would be. There was nothing the least bit malicious, *i.e.*, intentionally false, in the evaluation. Furthermore, proof of the element of "special harm" flowing to the Plaintiff therefrom is doubtful. *See* 42 Pa.C.S. § 8343(a)(6). The only recipient of the publication was Merrill. As Boland believably stated at his deposition, the evaluation was not surprising to him, on behalf of Merrill, under the circumstances of the Plaintiff's departure from PW, and was consistent with both what he would have expected PW to say about the Plaintiff and what he would have said if asked to evaluate the Plaintiff himself. Furthermore, he stated that it played no part in Merrill's ultimate dismissal of the Plaintiff, and the Plaintiff presented neither evidence nor even any allegation to the contrary.

Thus, the defamation claim of the Plaintiff, which we perceived, in our previous Opinion to be "unlikely" to be successfully established, *id.* at 860, is now definitely held by us to lack merit.

**3. *THE PLAINTIFF IS NEVERTHELESS ENTITLED TO RECOVER $4,533.33 IN DAMAGES FROM PW FOR ITS BREACH OF THE AGREEMENT TO PAY HIM $20,000 ANNUALLY FOR HIS TRAINING DUTIES***

As we have previously indicated, we believe that Lovejoy did in fact offer the Plaintiff $20,000 annually to perform training duties, but reneged on this agreement, resulting in the Plaintiff's receiving only $1,300 for performance of those duties between January 1, 1985, and April 15, 1985. By our calculation, the Plaintiff should have received compensation for three and a half out of twelve months, or $5,833.33, for duties performed as the training manager as of April 15, 1985. The Plaintiff therefore suffered compensable damages of $4,533.33. Again, however, the contract of the compensation which the Plaintiff was to be paid for training-manager duties was distinct from his earlier alleged employment contract. On the other hand, the fact that we deem this breach of a contract insufficient to justify the Plaintiff's extended sulking thereafter, resulting in his discharge, does not adversely impact upon the legitimacy of his claim for this amount.

The defense presented by the Defendant to this claim is that the offer of $20,000 was erroneously made as a result of the Plaintiff's own misrepresentation that he received this sum from Merrill for similar duties, when in fact all that he received from Merrill was a production credit in this amount. However, we credit the Plaintiff's testimony that he never misrepresented his compensation for these duties at Merrill. We also observe that Lovejoy did not state that he expressed this contention as a justification for the shortfall to the Plaintiff at the time. There is no evidence that Lovejoy even knew, as of April 15, 1985, how the Plaintiff was compensated for his training duties at Merrill. Furthermore, the Plaintiff's duties at PW were more extensive than those at Merrill, *i.e.*, he was to be PW's training *manager*, not just one of several "team leaders." There is therefore no reason to conclude that the Plaintiff's compensation at Merrill was in any way

relevant to what his compensation was or should have been at PW.

The only defense to this claim articulated at trial by Lovejoy was a denial that he ever offered the $20,000 figure to the Plaintiff. This contention is easily disproven by the testimony of former PW secretary Ann Haviland, in a deposition taken while she was in PW's employ, that she *saw* a memorandum confirming that Lovejoy *had* offered payment in this amount to the Plaintiff. It appears that, although Lovejoy in fact made a firm offer to the Plaintiff and believed that he had authority to offer it, it was vetoed by Chaiken or some other PW superior. Meanwhile, the Plaintiff performed the services in issue, logically assuming that he would be paid the sum which he had been promised. We hold that the Plaintiff is therefore entitled to this sum as a modest, but justified, measure of his damages for a breach of the particular contract, made by Lovejoy on behalf of PW, to compensate the Plaintiff $20,000 for serving as its training manager.

4. *THE PLAINTIFF IS ALSO ENTITLED TO RELIEF FROM PW'S CLAIM FOR RECOVERY OF THE ACA, AS ITS ACT OF DISCHARGING HIM RENDERED IT IMPOSSIBLE FOR HIM TO PERFORM THE FOUR YEARS OF SERVICE NECESSARY FOR HIM TO ELIMINATE HIS LIABILITY TO REPAY THIS SUM TO PW*

Finally, we address the legitimacy of PW's proof of claim, in which it seeks to recover $30,000 of the $40,000 ACA which it advanced to the Plaintiff. It is undisputed that the Plaintiff was to be relieved of any liability to repay this sum as long as he continued in the employ of PW for four years.

The principle of law controlling disposition of this issue is the maxim that a promisor cannot be held responsible to perform a contractual promise which the promisee prevents him from performing. *See, e.g., Rainier v. Champion Container Co.,* 294 F.2d 96, 103 (3d Cir.1961); *Pitts-*

*burgh Die Sinkers Lodge No. 50. v. Pittsburgh Forging Co.,* 255 F.Supp. 142, 145 (W.D.Pa.1966); and *Slater v. General Casualty Co.,* 344 Pa. 410, 414, 25 A.2d 697, 699 (1942). It is apparent that, having discharged the Plaintiff from its employ, PW prevented the Plaintiff from performing his undertaking to remain and have the liability to prepay the entire ACA eliminated, without further obligation on the part of the Plaintiff. Therefore, the Plaintiff should be relieved from his liability to repay PW by reason of its having discharged him.

We do not believe that this conclusion is inconsistent with our earlier decision that the Plaintiff has failed to establish an actionable claim for wrongful discharge, partially because his discharge was warranted by his own poor attitude and poor performance. While we feel that the Plaintiff overreacted to the breach of Lovejoy's promise to pay him for his training-manager duties, we are certainly not prepared to state that the Plaintiff ever intentionally failed to perform his duties. Certainly, there is considerable fault at the hands of the Defendants in the unfortunate deterioration of the parties' relationship. The Plaintiff did try to perform his duties. He was quite willing to pursue alternative positions with PW. The Defendants have never suggested that the Plaintiff intentionally tried to get himself fired or took any actions with the intention of attempting to evade any responsibilities which he had in reference to the ACA.

Therefore, although we believe that PW was justified in discharging the Plaintiff, we fail to find the Plaintiff guilty of any conduct so egregious as to have compelled his discharge. Only in such a circumstance would we conclude that PW could obtain repayment of the ACA when its act of discharging him was alone responsible for the failure of the obligation to, as the parties contemplated, simply disintegrate without the Plaintiff's having to recompense PW. PW obviously could have used its offices to have tried to smooth over the differences between Lovejoy and the Plaintiff, or have taken other active steps to

preserve its relationship with the Plaintiff. PW chose to discharge the Plaintiff, and did not present another firm job offer to him, although it considered him a viable candidate for same.

Also disturbing to us is PW's position that the Plaintiff only worked off one year of liability, even though he worked for PW just a month and a half shy of two years. This factor tends to suggest that Lovejoy timed the Plaintiff's discharge to maximize his liability. It also emphasizes the great degree of control exercised by PW over the Plaintiff's employment status and hence his duty to repay it.

Recognition of this degree of control causes us to conclude that PW should bear the full consequences of its having discharged the Plaintiff. One of the most obvious consequences was the destruction of the relationship which would allow the Plaintiff to "work off" his obligation to PW. We believe that PW should gracefully accept the fact that severance of this relationship should logically constitute a waiver of its right to reimbursement of the ACA, which it never could have anticipated to have recovered from the outset of the parties' relationship in any event.

We shall therefore proceed to disallow PW's proof of claim of $30,000 plus interest, in which it seeks repayment of the ACA from the Plaintiff.

E. CONCLUSION

An Order consistent with the Findings of Fact and Conclusions of Law set forth herein will be entered.

ORDER

AND NOW, this 10th day of February, 1989, after a trial on the above-entitled proceeding on September 27, September 29, September 30, October 4, and October 5, 1988, and review of the records and the post-trial submissions of proposed Findings of Fact, Conclusions of Law, and Memoranda by the parties, it is hereby ORDERED as follows;

1. Judgment is entered in favor of the Plaintiff, TOBIN FRYMIRE, and against Defendants PAINEWEBBER, INC. and LEE LOVEJOY, jointly and severally, in the amount of $4,533.33. All other claims of the Plaintiff against the said Defendants are DISMISSED.

2. The Proof of Claim of Defendant PAINEWEBBER, INC. (No. 8) is hereby DISALLOWED and shall be STRICKEN from the Claims Docket.

3. Barring an appeal and a stay of this Order, the aforesaid Defendants shall pay all sums due under the terms of this Order to the Standing Chapter 13 Trustee, Defendant EDWARD SPARKMAN, on or before March 6, 1989. The said Trustee shall determine whether this sum may be claimed as part of the Plaintiff's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith. Otherwise, he shall retain it as a non-exempt asset of the Plaintiff's estate.